In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3760

PATRICK J. O'REILLY,

Plaintiff-Appellant,

v.

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 7958--David H. Coar, Judge.

ARGUED SEPTEMBER 24, 2001--DECIDED November 30, 2001


   Before POSNER, RIPPLE and KANNE, Circuit
Judges.

   RIPPLE, Circuit Judge.  Patrick J.
O'Reilly is a beneficiary of a Long-Term
Disability Plan ("the Plan") administered
by Hartford Life & Accident Company.
After Hartford denied his claim for
benefits, O'Reilly filed suit under
ERISA, claiming that the denial violated
the terms of the Plan. The district court
granted summary judgment for Hartford.
Mr. O'Reilly appeals. For the reasons set
forth in this opinion, we affirm the
judgment of the district court.

I

BACKGROUND

A.

   Patrick O'Reilly was Senior Vice-
President and Chief Actuary of Montgomery
Ward & Company, Inc. ("Ward"). As a
result of a 1978 scuba diving accident,
O'Reilly is hearing impaired. In 1990, he
enrolled in the Ward Long-Term Disability
Plan. By then, he was required to use
hearing aids in both ears. The Plan
provided coverage for this pre-existing
condition. Mr. O'Reilly's hearing
progressively worsened and, in 1995, he
filed for short-term disability benefits

under the Plan. The physician's statement accompanying Mr. O'Reilly's claim for short-term disability diagnosed him with "bilateral sensorineural hearing loss" and reported that Mr. O'Reilly had "[d]ifficulty hearing, understanding, particularly in noise, in group situations and large listening areas." R.2, Ex.1(A). Mr. O'Reilly's position required him to attend group meetings, a function his condition made impossible.

Hartford Life & Accident Company ("Hartford"), the Plan's underwriter, approved his claim for short-term benefits. Mary Fisher of Hartford's Group Disability Department spoke with Mr. O'Reilly in January 1996 and suggested that he meet with Jim Radke, a vocational/rehabilitation specialist, to discuss modifications which could help Mr. O'Reilly perform his work. Hartford received several reports from Radke describing Mr. O'Reilly's limitations. According to Radke, "Mr. O'Reilly indicates that he has really no difficulty with the one-on-one communication, especially in an office setting. It is in loud or distracting environments that he experiences this problem." R.2, Ex.16. Radke also took note of Mr. O'Reilly's demeanor and outlook at their meetings, because Mr. O'Reilly also was suffering from depression, brought on by his hearing loss and inability to work.

In March 1996, Mr. O'Reilly filed a claim for long-term disability benefits. On May 20, 1996, Hartford sent a letter to Mr. O'Reilly informing him that his benefits were approved, retroactive to February 14, 1996. Mr. O'Reilly's pre-disability monthly pay was $13,452. His monthly benefits under the Plan would be 60% of that, less 50% of any salary earned. Mr. O'Reilly informed Hartford that he was earning $6,500 a month as an internal consultant to Ward. Therefore his monthly benefit would be $4,821.20. Mr. O'Reilly was required to submit a copy of his monthly paystub to Hartford.

On February 6, 1997, after a routine internal review as the one-year initial period concluded, Hartford sent Mr. O'Reilly a letter informing him that his benefits would terminate after February 13, 1997, because he was no longer disabled within the meaning of the Plan./1 Joanne Wiskow of Hart-ford had

reviewed Mr. O'Reilly's medical information, Radke's reports and Mr. O'Reilly's paystubs before concluding that he was no longer disabled. The letter informed Mr. O'Reilly of his right to appeal and to submit additional information. Mr. O'Reilly requested some documents from Hartford before he filed his appeal and received medical information and Radke's reports.

Mr. O'Reilly retained counsel and appealed, submitting a Transferable Skills Analysis ("TSA") performed by avocational consultant whom Mr. O'Reilly had retained for the appeal. Mr. O'Reilly's TSA, conducted by vocational consultant Rita Wolven, could find no job paying more than $45,000 per year which was available to him. However, the TSA took into account Mr. O'Reilly's depression, which was not covered under the Plan. Patricia Swanson, Regional Manager of Hartford's claims office handled the appeal. Swanson or her deputies reviewed the same material that had been before Wiskow and did some additional research. Wiskow spoke with an official at Ward who confirmed Mr. O'Reilly's consulting job; Fisher spoke again with Radke who concluded that Mr. O'Reilly's physical condition alone did not prevent him from doing his job; Fisher reviewed the TSA performed by Mr. O'Reilly's consultant; Swanson spoke with the actuarial department at Hartford and Jim Weiss of the Chicago Society of Actuaries. Hartford's actuarial department and Weiss identified numerous positions a person with Mr. O'Reilly's experience and physical limitations could perform. Some of these paid more than $100,000 per year. With this information before her, Swanson denied the claim.

B.

Mr. O'Reilly filed suit under Section 502 of the Employee Retirement Income Security Act ("ERISA") which provides that "a civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights for future benefits under the terms of the plan." 29 U.S.C. sec. 1132(a). After discovery, Hartford moved for summary judgment and the district court granted Hartford's motion.

First, the court excused Mr. O'Reilly from ERISA's exhaustion requirement;/2 because the executive who would hear his appeal had already approved the denial of benefits, any further appeal would be futile. Second, the court found that Hartford's denial of benefits was within a reasonable interpretation of the Plan.

II

DISCUSSION

A.

We review the district court's grant of summary judgment de novo. See Quinn v. Blue Cross & Blue Shield Assoc., 161 F.3d 472, 475 (7th Cir. 1998). In determining whether an individual is entitled to benefits, a court normally examines the plan documents and interprets them de novo under federal rules of contract interpretation. Hammond v. Fid. & Guar. Life Ins. Co., 965 F.2d 428, 429-30 (7th Cir. 1992). However, if the plan gives the administrator discretionary authority to interpret the plan and to make eligibility determinations, a court will overturn that decision only if it is arbitrary and capricious. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

The Plan at issue states that "The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy." R.2, Ex.3 at 4. Therefore, we shall review Hartford's decision deferentially. See Carr v. Gates Health Plan, 195 F.3d 292, 294 (7th Cir. 1999) (quoting Butler v. Encyclopedia Brittanica, Inc., 41 F.3d 285, 288 (7th Cir. 1994)). Under the arbitrary and capricious standard, we shall not set aside the denial of a claim if the carrier's denial is based on "a reasonable interpretation of the relevant plan documents." Cuddington v. N. Ind. Pub. Serv. Co., 33 F.3d 813, 817 (7th Cir. 1994) (citations omitted). Mr. O'Reilly concedes the applicability of this standard of review, but argues that we should scrutinize Hartford's decision more carefully because of its alleged conflict of interest.

The presence of a conflict of interest does not change the standard of review.

See Firestone, 489 U.S. at 115; Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan, 195 F.3d 975, 981 (7th Cir. 1999); Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 815 (7th Cir. 1997). It is a factor to be considered when deciding whether an administrator's decision was arbitrary and capricious. See Firestone, 489 U.S. at 115. In the absence of specific evidence of bias, we shall not presume that there is a significant bias. See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1020 (7th Cir. 1998); Cuddington, 33 F.3d at 816. Mr. O'Reilly has not presented any specific evidence of a conflict of interest and, therefore, we shall not consider that factor in our determination of the reasonableness of Hartford's decision.

Mr. O'Reilly's challenge to Hartford's decision runs along two tracks. First, Mr. O'Reilly contends that Hartford's interpretation of the Plan was unreasonable because it failed to find him "totally disabled" when he was not capable of earning at least 60% of his pre-disability income. His second line of argument urges us to reverse Hartford's decision because it failed "to engage in an intensive and scrupulous independent investigation" to insure that it acted in the "best interest of the plan beneficiaries." See Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998) (internal quotations omitted). Because of this failure to investigate, Mr. O'Reilly argues, Hartford could not have based a reasonable decision on the evidence before it.

B.

We first address Mr. O'Reilly's contention that Hartford's interpretation of the Plan was unreasonable because it failed to find him "totally disabled" when he was not capable of earning at least 60% of his pre-disability income. At the outset, it is important to note that the Plan has two different disability periods. During the first disability period, which lasts one year, benefits are provided to a beneficiary who is prevented by a disability "from doing each and every duty of [his] occupation." R.1, Ex.3. In contrast, for the time following this twelve month

period, benefits are provided "for as long as [the beneficiary] . . . [is] prevented by Disability from doing any occupation or work which [he is] or could become qualified by: (1) training; (2) education; or (3) experience." Id. The first period is not at issue here; Mr. O'Reilly received benefits during that period because Hartford agreed that his hearing loss had prevented him from performing every duty of his position as Chief Actuary. The dispute here focuses on the second period and the determination that Mr. O'Reilly is not totally disabled because he is not unable to perform any occupation. We must determine whether Hartford's interpretation of this provision is a reasonable interpretation of the relevant plan documents.

In Hammond v. Fidelity & Guaranty Life Insurance Company, 965 F.2d 428, 429 (7th Cir. 1992), we were confronted with a plan that contained a provision very similar to the one before us today. In interpreting that plan under a de novo standard, we held that "the insured should be entitled to recover provided he or she is unable to perform all the substantial and material acts necessary to the prosecution of some gainful business or occupation." Hammond, 965 F.2d at 431. The plaintiff was required to demonstrate that he was "disqualified from all other forms of gainful employment." Id. We believe that Hartford acted well within its discretion in determining that the language of the present plan sets forth the same standard as the one we determined to be applicable in Hammond.

Mr. O'Reilly argues that the Plan requires a finding of total disability if he is not able to earn at least 60% of his pre-disability income. He maintains that any position that does not provide compensation at this level ought not be considered an occupation for which he is or could become qualified. After all, if he was totally disabled he would receive 60% of his former income. However, the plain language of the Plan provides for no such replacement income standard. In fact, there is no replacement income standard of any kind. Hartford admits that it does look to such a standard as one factor in guiding its total disability decision. When a claimant's

replacement income is less than 60% of pre-disability income, that factor weighs in favor of a finding of total disability. However, it is only one factor, and the inability to earn 60% of pre-disability income is neither a necessary nor a sufficient condition of a total disability finding.

We think the record contains enough evidence to support Hartford's position and that its interpretation is not an unreasonable one. Indeed, Hartford's internal claims manual expressly states that a replacement income standard is not a hard and fast rule. Hartford correctly points out that the application of such a rule to highly paid employees like Mr. O'Reilly would produce results incompatible with the purpose of a total disability policy. A person earning $1,000,000 per year would be entitled to total disability benefits if he were capable of working in a job that paid him $599,000 a year despite his physical impairment. By contrast, an individual earning $15,000 per year who made $9,000 per year while disabled would not be entitled to total disability benefits because his current income, unlike that of the wealthy person, would constitute 60% of his pre-disability income.

In any event, Hartford also identified positions that paid $96,000, which was 60% of Mr. O'Reilly's pre-disability income. These positions were in the actuarial field, and Mr. O'Reilly clearly was qualified for these jobs by virtue of his training and experience. Indeed, his ability to perform the duties of his actuarial consulting position demonstrates that he had the skills and ability to perform such positions.

C.

We now turn to Mr. O'Reilly's contention that Hartford failed "to engage in an intensive and scrupulous independent investigation" to insure that it acted in the "best interest of the plan beneficiaries." See Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998) (internal quotations omitted). Before denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision. See Quinn v. Blue Cross & Blue Shield Assoc., 161 F.3d 472,

476-77 (7th Cir. 1998). ERISA does not require a "full-blown" investigation, but it does demand a "reasonable inquiry" into a claimant's medical condition and his vocational skills and potential. See id. If Hartford did not have evidence on which to base its conclusion, it would have acted unreasonably.

Mr. O'Reilly contends that the evidence was lacking in three respects. First, Hartford did not perform a Transferrable Skills Analysis ("TSA"). Second, his consulting position was such that Hartford could not reasonably have drawn any inference of capability on his part from it. Third, Hartford's reliance on Radke, its vocational/rehabilitation consultant, was misplaced and unreasonable. On each of these points, we believe the evidence was sufficient and that Hartford drew reasonable and permissible inferences from it.

1.

A TSA, properly conducted, takes a claimant's skills, experience and disability into account and produces a list of potential jobs. Mr. O'Reilly retained a vocational consultant to perform a TSA in support of his internal appeal at Hartford. Using a computer program, she could find no job where Mr. O'Reilly could earn more than $45,000 per year. Hartford considered performing a TSA but then concluded that, given Mr. O'Reilly's high income, such an effort would be futile. Further, Hartford disputed the results of Mr. O'Reilly's TSA because the study assumed that Mr. O'Reilly was disabled due to depression, a condition excluded from coverage under the Plan, and because it assumed that the plaintiff was limited to sedentary work which simply was not correct. It also incorrectly assumed that Mr. O'Reilly was totally deaf.

Hartford did not perform its own TSA, but there was sufficient evidence of record about the futility of performing such a study to make Hartford's decision reasonable. Hartford determined that a TSA in this situation would be worthless because it was incapable of identifying any high paying jobs regardless of physical capabilities or experience--it was limited to entry level positions. The claims manual states that a TSA may be

helpful in determining other fields in which an individual may be able to find employment, but Hartford already had information that Mr. O'Reilly was performing actuarial work. Moreover, Hartford found that his years of training and experience made him eligible for other actuarial positions paying $96,000 or more. In short, there was no necessity to inquire further about the transferability of Mr. O'Reilly's skills.

2.

Mr. O'Reilly argues that the actuarial work he was performing was not substantial and that it was unreasonable for Hartford to use his consulting position with Ward as evidence of his capabilities. Mr. O'Reilly maintains that this position was temporary and required very little actual work; he was only kept on Ward's payroll to assure a smooth transition for his successor. Nevertheless, this assignment was an actuarial position and Mr. O'Reilly was able to provide a service to Ward worth $6,500 per month. While the job may not have been exceptionally demanding, it is evidence that Mr. O'Reilly is capable of using his substantial skills and experience to the benefit of an employer. If someone is willing to pay Mr. O'Reilly $78,000 per year to do an undemanding job, Hartford was entitled to consider this fact as evidence of his continuing value in the marketplace. The limited duration of the position does not make it irrelevant to Hartford's inquiry. Indeed, in its research, Hartford had identified other actuarial positions, paying as much as $100,000 per year that Mr. O'Reilly could perform. His service with Ward permitted a reasonable inference that he was physically capable of performing the duties of those other positions Hartford had identified. By contrast, under the terms of the Plan, if an individual's services are no longer of significant value to a prospective employer, then he is totally disabled; Mr. O'Reilly paid to protect against this eventuality. Thedistrict court determined, and we agree, that Mr. O'Reilly has not produced any evidence that tends to show that he was incapable of performing the duties of the jobs that Hartford has identified. Based on Mr. O'Reilly's medical records and Radke's reports, Hartford developed

an assessment of Mr. O'Reilly's physical limitations. Swanson then directed an inquiry tailored to Mr. O'Reilly's skills and his high income. She spoke with Hartford's actuarial department and Weiss of the Chicago Society of Actuaries. They were able to identify numerous positions, within Mr. O'Reilly's field, which he was capable of filling. Given Hartford's efforts, Mr. O'Reilly must show that Hartford's conclusion is unreasonable. The Plan requires that Mr. O'Reilly be disabled from "any occupation." Without evidence showing that he could not have performed the jobs Hartford identified as potentially available to him, we cannot conclude that Hartford's decision was arbitrary and capricious.

   This case is substantially different from the situation with which we were confronted in Quinn. There, the claimsadministrator denied a claim for benefits because she believed that the claimant was capable of performing another job, given the duties of her previous one. Quinn, 161 F.3d at 476. However, the administrator based this decision on "her own notion of what a payroll account assistant does." Id. We noted that "[t]his, without more, is not enough." Id. In this case, there is significantly more. Rather than rely on her own notion of what actuaries did, and what jobs would be available to an actuary with Mr. O'Reilly's disabilities, Swanson spoke with Hartford's actuarial department and with Jim Weiss of the Chicago Society of Actuaries. In Quinn, we stated that the administrator "should have identified the skills necessary to obtain another job and whether [the claimant] possessed those skills." Id. Here, Swanson did just that by turning to those who would be more familiar with actuarial work than any other group.

3.

   Finally, Mr. O'Reilly challenges Hartford's reliance on Radke's views. Mr. O'Reilly contends that Radke was not qualified to assess Mr. O'Reilly's vocational capacity and that he was not an independent examiner. Standing alone, Radke's reports may not have been enough to support a denial of Mr. O'Reilly's claim. However, his reports were quite detailed and included specific

information about Mr. O'Reilly's abilities and limitations. Hartford was not required to perform a second assessment of Mr. O'Reilly when it had vocational reports before it. Hartford's agents also followed up with Radke, speaking to him on the phone on several occasions to fill in whatever gaps might have been present in the reports. Mr. O'Reilly has not offered any evidence that would question the veracity of Radke's reports or his motivations. With no evidence of bias or ineptitude, Radke appears to be a qualified vocational consultant from an independent agency. His reports describe Mr. O'Reilly's working conditions, his limitations and the modifications necessary to overcome those limitations. Combined with the rest of the evidence before Hartford, reliance on Radke's reports was reasonable.

Conclusion

Hartford's interpretation of the Plan was reasonable. The evidence before it permitted a reasonable inference that Mr. O'Reilly was not totally disabled within the meaning of the Plan. Hartford's decision to deny Mr. O'Reilly's claim was not arbitrary and capricious. Therefore, the decision of the district court is affirmed.

AFFIRMED

FOOTNOTES

/1 Under the Plan:

"Totally Disabled means:

(1)  During the Elimination Period; and

(2)  for the next 12 months,

you are prevented by Disability from doing each and every duty of your own occupation. After that, and for as long as you stay Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by:

(1)  training;

(2)  education; or

(3)  experience.

'Your own occupation' includes similar job posi-

tions with the Policyholder which may be offered to you with a rate of pay greater than 70% of your Pre-disability Earnings for those enrolled in Benefits Percentage Option I, and 60% of your Pre-disability Earnings for those enrolled in Benefit Percentage Option II."

R.1, Ex.3.

/2 Hartford challenges the district court's ruling on the exhaustion issue. Because Hartford's decision was reasonable and we are affirming the district court's grant of summary judgment, we need not reach this question.