In the

# United States Court of Appeals

### For the Seventh Circuit

No. 00-2260

APS SPORTS COLLECTIBLES, INC.,

*Plaintiff-Appellant,*

*v.*

SPORTS TIME, INC., a Corporation,
HARLAN J. WERNER, MICHAEL K. SPEAKMAN,
THOMAS CHEN, PATRICK KWAN,
LEE J. KOLLIGAN, ROBERT BYER,
BILL A. MOLLER, and PAUL SIEGAL,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 93-4160—**William L. Beatty**, *Judge.*

ARGUED SEPTEMBER 5, 2001—DECIDED JULY 22, 2002

Before CUDAHY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This is diversity case involving a dispute about money between APS Sports Collectibles, Inc. and Sports Time, Inc. The focus of their controversy is a loan default and a transfer of assets from a now bankrupt corporation, AW Sports, to the defendant. A few months after APS extended a loan to AW Sports, AW Sports

was purchased by Sports Time in a stock-for-stock exchange. After various items of its inventory and equipment were transferred to Sports Time, AW Sports entered bankruptcy. APS subsequently filed suit against Sports Time on APS's loan to AW Sports, joining various current and former officers of Sports Time and AW Sports as defendants. The district court dismissed all the counts of APS's complaint except one count of fraudulent transfer under the Illinois Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/1 *et seq.*

After full discovery, the district court granted summary judgment for the noncorporate defendants, and the case against Sports Time proceeded to trial. APS received a favorable jury verdict, and the district court in turn awarded damages in the amount of $266,594. APS now appeals (1) the dismissal of a purported good faith and fair dealing cause of action under Illinois law, (2) the grant of summary judgment for the noncorporate defendants and (3) the method used by the district court to calculate damages. For the reasons discussed below, we affirm.

I.

This case involves three close corporations and various corporate officers and/or shareholders in their individual capacities. The plaintiff, APS Sports Collectibles, Inc. (APS), is an Illinois corporation in the business of distributing magazines and sports collectibles, such as sports trading cards. The defendant, Sports Time, Inc., is a Nevada corporation, which was formed to sell and distribute similar sports collectibles. Another entity that is at the center of this lawsuit is the now defunct company, AW Sports, Inc., which is a California corporation formerly in the business of manufacturing trading cards. APS and AW Sports entered into a loan agreement, providing for a $629,333 loan to AW Sports, essentially secured in part by AW Sports'

promise to manufacture and deliver to APS certain trading cards. During the term of the loan agreement, Sports Time purchased all the outstanding stock of AW Sports through an exchange of stock. Thereafter, various officers/shareholders of AW Sports and Sports Time assumed new positions in the two entities. APS has joined as defendants, in their individual capacity, the following officers and/or shareholders: Harlan J. Werner, Michael K. Speakman, Thomas Chen, Patrick Kwan, Lee J. Kolligan, Robert Byer, Bill Moller and Paul Siegal.

During the early 1990s, AW Sports had several attractive licensing agreements with various celebrities and athletes. However, the company was undercapitalized and needed cash to manufacture its merchandise. So, as we have indicated, in August of 1992, APS lent AW Sports $629,333 in exchange for a promise to manufacture and ship to APS a set of 1992 NFL trading cards. Shipments of the finished product that were received and sold by APS were then credited against the outstanding loan. AW Sports had agreed to liquidate the loan in full by April 4, 1993 (i.e., within 150 days). As further security, AW Sports pledged sufficient shares of its corporate stock to represent a controlling interest. At that time, 600 shares of AW Sports were outstanding. However, physical possession of the stock certificates was never gained by APS nor were the certificates placed in escrow,[1] and there is some question whether, in the event of default, AW Sports agreed to convey existing shares of AW Sports, or merely to exercise its right under the corporate charter to issue additional

---

[1] Under Article 8 of the Uniform Commercial Code, "A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of Section 8-313(1)." 810 ILCS 5/8-321(1). APS also failed to follow an alternate method for obtaining a security interest, which is provided in § 8-321(1)(h).

shares of stock sufficient to give APS a controlling interest. As part of the loan agreement, AW Sports agreed that it would "retain through the life of the loan good and clear title to the stock, free of any encumbrance."

On December 2, 1992, while the 150-day repayment period was running, Sports Time entered into an acquisition agreement with AW Sports whereby all outstanding shares of AW Sports would be converted to Sports Time stock in a stock-for-stock exchange. Under the terms of the agreement, all the assets, obligations and debts of AW Sports were transferred to Sports Time. Moreover, the stock purchase agreement between Sports Time and AW Sports explicitly recognized the outstanding debt to APS. An AW Sports financial statement on December 15, 1992, listed a product inventory valued at $350,000 and equipment worth $621,000. This was two weeks before the closing of the acquisition of AW Sports by Sports Time on January 2, 1993.

APS was not informed of Sports Time's acquisition of AW Sports until after the deal was complete. During the course of the 150-day loan repayment period, some of the trading cards that were promised to APS were delivered to it at later dates than those specified in the loan agreement. Once they were delivered to APS, sales were disappointing, and the satisfaction of AW Sports' outstanding debt to APS was delayed. In March of 1993, it became apparent that AW Sports was about to default on its loan. Therefore, a meeting between APS, AW Sports and Sports Time was held in St. Louis. Despite these discussions, the loan went unpaid as of the April 3 due date. On April 19, APS sent a letter to officers of both AW Sports and Sports Time demanding payment of the debt. On May 3, a second letter was sent demanding that an escrow of AW Sports' corporate stock be set up and, further, demanding payment for the overdue loan.

On May 20, only seventeen days after the second letter from APS, AW Sports filed a petition in bankruptcy listing APS as a secured creditor who was owed $629,333. AW's bankruptcy petition listed the value of its inventory at only $16,800 and its equipment at $1,325. These figures represented an approximate $950,000 drop in asset value since AW Sports' December 1992 financial statement. During the five-month period since December, neither Sports Time nor AW Sports made any payment to APS on the outstanding promissory note.

In June of 1993, APS filed this lawsuit against Sports Time and various current and former officers and shareholders of Sports Time and AW Sports. The corporate entity, AW Sports, was protected from being named as a defendant in this litigation by the automatic bankruptcy stay. At the close of discovery, Sports Time and the noncorporate defendants filed a motion for summary judgment, which the district court granted, with the exception of one count under the Illinios Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/1 *et seq.*, which APS was required to replead.

In October 1995, the defendants filed for summary judgment on the surviving UFTA claim, while APS requested the district court to reconsider its earlier dismissal of a good faith and fair dealing cause of action. On January 16, the district court granted summary judgment for the individual defendants on the UFTA claim and refused to reconsider the dismissal of the good faith and fair dealing claim. The UFTA claim against Sports Time was then tried to a jury in September of 1996. Although APS received a favorable jury verdict, special interrogatories revealed some confusion by the jury about whether the fraudulent transfer, which it found, involved shares of AW stock rather than the underlying corporate assets.

After a new trial was ordered and the case was transferred to another district court judge, APS renewed its mo-

tion to reinstate its good faith and fair dealing claim, which was once again denied. In July of 1997, a jury again returned a verdict for APS. After conducting a hearing on damages, the district court entered a judgment for APS in the amount of $266,594. APS then filed a post-trial motion, arguing that the language of the UFTA required a different approach to calculating damages. The district court denied APS's motion. This appeal followed.

## II.

APS presents three issues on appeal: (1) the district court erred when it ruled that Illinois law does not authorize an independent tort action for breach of the duty of good faith and fair dealing; (2) the district court improperly granted summary judgment for the noncorporate defendants; and (3) the district court used an incorrect method to calculate damages under the UFTA. Because all of these issues raise questions either of statutory interpretation, or of the propriety of summary judgments, or otherwise of matters of law rather than matters of fact, the standard of review is *de novo*. *See O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 959 (7th Cir. 2001) (summary judgment); *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001) (motion to dismiss); *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572, 579 (7th Cir. 2001) (interpretation of an Illinois statute). We will discuss each of these issues in order.

## A.

According to APS, Illinois law authorizes an independent cause of action for breach of the duty of good faith and fair dealing. However, the cases it cites in support of this notion all involve insurance disputes in which an Illinois court upheld a tort claim, and thus compensatory damages,

if an insurer had refused to negotiate settlements in good faith. *See, e.g.*, *Emerson v. American Bankers Ins. Co.*, 585 N.E.2d 1315, 1320, 223 Ill. App. 3d 929, 935-36 (1992) (holding that compensatory damages are available for the "breach of the duty of good faith and fair dealing"); *Kohlmeier v. Shelter Ins. Co.*, 525 N.E.2d 94, 104, 170 Ill. App. 3d 643, 657 (1988) (same). In response, the defendants contend that under Illinois law the covenant of good faith and fair dealing is not an independent source of duties for parties to a contract, but instead an implied term that "guides the construction of explicit terms in an agreement." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (citing Illinois cases).

Fortunately, we need not belabor this issue because the Illinois Supreme Court has recently resolved it. In *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 196 Ill. 2d 288, 296 (2001), which involved a dispute between a mortgage company and one of its customers, the Court held that breach of the covenant of good faith and fair dealing is not an independent cause of action under Illinois law except "in the narrow context of cases involving an insurer's obligation to settle with a third party who has sued the policy holder." 751 N.E.2d at 1131. *Voyles*, which was decided after APS filed its brief in this case, is dispositive of this issue.

## B.

APS's second issue on appeal involves the question whether any of the current or former officers and/or shareholders of Sports Time and AW Sports can be liable in their individual capacity for a fraudulent transfer claim under the UFTA. As a threshold matter, it is undisputed that the agreement between APS and AW Sports is a contractual arrangement between two corporate entities. The only signatory for AW Sports to any of the documents that

were involved in the transaction was Lee Kolligan, who was acting in his capacity as the company's vice-president. Under Illinois law, "'A Corporation is a legal entity which exists separate and distinct from its shareholders, officers, and directors, who are not, as a general rule, liable for the corporation's obligations.' ... Limited liability will ordinarily exist even though the corporation is closely held or has a single shareholder." *In re Estate of Wallen*, 633 N.E.2d 1350, 1357, 262 Ill. App. 3d 61, 68 (1994) (quoting and citing *Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 563, 91 Ill. App. 3d 999, 1004 (1980)).

In this case, APS agreed to lend $629,333 to AW Sports in exchange for a promise to manufacture and deliver a specified volume of trading cards. The physical delivery and resale of the cards served to reduce the balance of the loan, which was scheduled for full repayment by April 4, 1993. As collateral for the loan, the corporate entity, AW Sports, executed a security agreement with the corporate entity, APS, which pledged as collateral "such amount of shares of common stock in AW Sports, Inc., a California corporation, sufficient to secure the necessary votes for Board of Director and Shareholder action, at this time and throughout the duration of the Agreement." It was unclear from the face of the Agreement, however, whether the collateral consisted of existing stock, unissued stock or some combination of the two sufficient to confer control of AW Sports. The district court therefore ruled that any combination providing control of AW Sports would be permissible. Yet, as the district court also determined, APS and AW Sports failed to comply with the requirements of Article 8 of the Uniform Commercial Code, 810 ILCS 5/8-101 *et seq.*, requiring physical transfer of stock certificates from debtor to creditor in order for the security agreement to be enforceable. Such a transfer would have secured to APS a controlling interest in AW Sports in the event that AW Sports defaulted on the loan. APS has not appealed the finding

that nondelivery of the stock to APS rendered the security agreement unenforceable. As a result, when officers of AW Sports received stock from Sports Time in a stock-for-stock transaction, APS had no legal entitlement to the 600 shares of AW Sports stock involved in the AW Sports-Sports Time deal, which were apparently all owned by various AW Sports corporate officers in their *individual* capacities.

Unfortunately, APS fails to articulate a coherent theory why the individual defendants should be held liable under the UFTA. Under Illinois law, a claim for a fraudulent transfer "requires a debtor/creditor relationship." *A.P. Properties, Inc. v. Goshinsky*, 714 N.E.2d 519, 522, 186 Ill. 2d 529 (1999). The UFTA defines a "debtor" as "a person who is liable on a claim." 740 ILCS 160/2(f). Although AW Sports is the most logical party to be designated as a debtor, *see* 740 ILCS 160/8, it is not a defendant in this lawsuit because of the automatic stay imposed under the Bankruptcy Code. In addition, since none of the individual defendants in this case was a party to the APS loan transaction, their status as debtors cannot be established under any of the agreements entered into by APS and AW Sports.

Nonetheless, APS seems to argue that the individual defendants are liable under the UFTA because of their status as "insiders" of a debtor corporation. 740 ILCS 160/2(g)(2) (listing various categories of "insiders," including "director of the debtor," "officer of the debtor," "person in control of the debtor"). For example, APS points out that defendants Werner, Speakman, Chew, Kwan and Kolligan were all "insiders" who approved a corporate resolution promising a controlling interest in AW Sports as collateral for the APS loan. Yet, these same individuals also benefitted when AW Sports was purchased by Sports Time in a stock-for-stock exchange.

While these allegations may well be true, they fail to state a valid claim. Under the UFTA, "insider" is a defined

term that is used to establish whether a transfer is fraudulent. *See*, *e.g.*, 740 ILCS 160/2(g)(2) (defining the term "insider"); 160/5(b)(1) (listing "transfer or obligation" to an "insider" as one of the factors that can be relied upon to determine intent to hinder, delay, or defraud any creditor of the debtor); 160/6(b) (stating that a transfer is fraudulent "if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent"). However, once the fraudulent nature of the transaction is established, 740 ILCS 160/8 provides the creditor with various equitable remedies for the acts of "debtors" and "transferees." Similarly, 160/9 permits a money judgment against "(1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee." In short, an individual's status as an "insider" in the present circumstances simply has no relevance for the purpose of assigning liability under the UFTA.[2] Despite the fact that the UFTA has been adopted in whole or in part by

---

[2] It is certainly possible that other facts might make an insider, or corporate officer, liable under the UFTA because of his or her status as "first transferee," "subsequent transferree" or "debtor." *See*, *e.g.*, *New Horizon Enter. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 16-17 (Minn. Ct. App. 1997) (assigning personal liability to corporate officer because he was a "first transferee" of an asset within the meaning of the UFTA, thus making it unnecessary for the court to address a "piercing the corporate veil" argument). However, APS failed to develop the factual application of this theory in an action against an individual defendant. The argument has therefore been waived. *See*, *e.g.*, *Muhich v. Commissioner of Internal Revenue*, 238 F.3d 860, 864 n.10 (7th Cir. 2001) ("Where, as here, a party fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusions, the argument is deemed waived.").

approximately thirty states, APS provides no legal authority for its theory that, essentially, corporate insiders are personally liable for the acts of a corporation.

APS's next argument, which is also somewhat difficult to decipher, seems to assert that the individual defendants should be held personally liable under the UFTA because the corporations they controlled were engaging in a "shell game" designed to disperse the assets of AW Sports, thus undermining APS's lawful claims. For example, APS points to deposition testimony of Mark Krekeler, an AW officer, which suggests that as of August 1993, two entities, MKS Distributors and Triple Play Sports Cards, had in their possession an "appreciable quantity of AW product for sale." MKS Distributors is apparently owned by Michael Speakman, who served as an officer of AW Sports and became a Sports Time officer after the stock-for-stock exchange. In addition, Triple Play operated out of the same address as Sports Time, indicating control by Sports Time. APS also points to a licence for Marilyn Monroe memorabilia, formerly owned by AW Sports, which resurfaced in mid-1993 in the possession of a subsidiary half owned by Sports Time. Similarly, a lithograph printing machine formerly owned by AW Sports was located at Cal-Pak, a wholly-owned subsidiary of Sports Time. Cal-Pak apparently paid the salary of Bill Moller, who served as an officer of AW Sports and later of Sports Time following the stock-for-stock exchange. Based on all of these facts, APS claims that all of the individual defendants "had the requisite knowledge and intent to commit fraud under the UFTA."

The primary flaw in APS's argument, however, is that it fails to explain which provision of the UFTA permits a court to impose *personal liability* on a corporate officer for authorizing a bad faith transaction that works to the detriment of a creditor. The language of the UFTA simply does not support such a result.

APS attempts to save its UFTA theory by invoking the interesting turn of phrase that "the corporate veil here was transparent." Yet, if APS had an expectation of piercing the corporate veil, it has failed to develop a legal and factual basis to support such a claim. Under Illinois law, a plaintiff attempting to make an individual liable for the acts of a corporation must show (1) that there exists such unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist; and (2) that there exist circumstances such that an adherence to the fiction of separate corporate existence would likely produce an unjust or inequitable result. *Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992, 1005, 321 Ill. App. 3d 946, 958 (2001). Similarly, in order to pierce the veil between a parent and a subsidiary, a plaintiff must make "a substantial showing that one corporation is really a dummy or sham for another." *In re Estate of Wallen*, 633 N.E.2d at 1357 (quotations omitted).

Despite the benefit of discovery against the individual defendants, APS has failed to allege and demonstrate specific facts and indicate their relevance under the correct legal standard. As we have noted on previous occasions, "'[i]t is not this court's responsibility to research and construct the parties' arguments,'" and conclusory analysis will be construed as waiver. *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)). In addition to the fact that APS's piercing the veil argument is undeveloped and inadequate, it also appeared for the first time in its reply brief, which is too late. *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived"); *accord Help At Home Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 n.2 (7th Cir. 2001); *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 n.1 (7th Cir. 2001).

## C.

The final issue is whether the district court erred in its calculation of damages. APS contends that the language of the UFTA requires a calculation of damages as equal to the amount owed at the time of the fraudulent transfer rather than at the time of the lawsuit (when more sports cards produced by AW had been sold by APS, thereby reducing AW Sports' total liability on the loan).

This argument is wholly without merit. The language of the UFTA states that "a creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, *whichever is less.*" 740 ILCS 160/9(b)-(c) (emphasis added). The trial court calculated both of these amounts and determined that the amount necessary to satisfy APS's claim was the lesser. The qualifying language in subsection (c), which mandates a valuation of an asset at the time of transfer if the calculation "is based on the value of the asset," does not apply if "the amount necessary to satisfy the creditor's claim" is the proper benchmark, as it was here. *Id.*

## III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*