**Sandra M. MENNENOH, Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

No. 02–C–567–C.

United States District Court,
W.D. Wisconsin.

July 16, 2003.

Michael F. Durst, Superior, WI, for Plaintiff.

John Harper, III, Krass Monroe, P.A., Minneapolis, MN, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Sandra M. Mennenoh contends that defendant UNUM Life Insurance Company of America terminated her long-term disability insurance benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461. Jurisdiction is present under 28 U.S.C. § 1331.

Presently before the court is defendant's motion for summary judgment. The issue is whether defendant acted arbitrarily and capriciously when it terminated plaintiff's disability benefits. Because I conclude that it did, I will deny defendant's motion for summary judgment and, on the court's own motion, I will grant summary judgment in favor of plaintiff. Although plaintiff did not file her own motion for summary judgment, "a district court can enter summary judgment sua sponte, or on its own motion, under certain limited circumstances." *Simpson v. Merchants Recovery Bureau, Inc.,* 171 F.3d 546, 549 (7th Cir. 1999). In this case, because defendant had notice that the court would be considering summary judgment and because the evidence is limited to the administrative record, summary judgment in favor of plaintiff is appropriate even though plaintiff did not file her own motion. *Id.*

From the proposed findings of fact submitted by defendant and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *Disability Plan*

Plaintiff Sandra M. Mennenoh, a resident of Grandview, Wisconsin, was employed by Memorial Medical Center from June 1997 until August 1999. Plaintiff was insured under Group Insurance Policy No. 390254001, administered by defendant UNUM Life Insurance Company of America, with an effective date of October 1, 1994.

The policy defines disability in the following provision:

You are disabled when UNUM determines that:

— you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

— you have a 20 percent or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

"Material and substantial duties" means duties that:

— are normally required for the performance of a regular occupation; and

— cannot be reasonably omitted or modified.

"Regular occupation" means the occupation you are routinely performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

Under the policy, the insured is required to show the following at their expense.

— that you are under the regular care of a doctor;

— the appropriate documentation of your monthly earnings;

— the date your disability began;

— the cause of your disability;

— the extent of your disability, including restrictions and limitation preventing you from performing your regular occupation; and

— the name and address of any hospital or institution where you received treatment, including all attending doctors.

The policy also states: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."

### B. *Plaintiff's Claim for Long– Term Disability Benefits*

#### 1. *Plaintiff's medical history*

Plaintiff's duties at Memorial included preparing food, stocking freezers and replenishing supplies. On April 14, 1999, plaintiff saw Dr. Marianne Anderson for the first time for "back pain radiating down." On or about May 24, 1999, Memorial reduced plaintiff's hours from 72 hours every two weeks to 48 hours every two weeks. On May 25, 1999, James D. Callahan, M.D., a neurologist, restricted plaintiff to working only three days a week at Memorial. On August 30, 1999, Callahan recommended that plaintiff stop working as a food service worker because she was not physically able to perform her duties. Plaintiff's last day of work at Memorial was August 31, 1999. On September 21, 1999, Callahan performed back surgery on plaintiff.

#### 2. *Plaintiff's application for long-term disability benefits*

Plaintiff filed an application for long-term disability benefits, claiming that as of April 19, 1999, she was no longer able to perform the material and substantial duties of her occupation at Memorial because of "back pain and pains down legs." Plaintiff claimed that standing on her feet and lifting at work caused or exacerbated these symptoms.

Included with plaintiff's claim was a statement by her employer, signed by Diane Lulich and dated August 1, 1999. According to the statement, plaintiff's position with Memorial of "cook/food service worker" required her to stand continuously, walk frequently, stoop, kneel and crouch occasionally, reach and work overhead frequently, push food carts and boxes weighing 100 pounds frequently, pull food carts weighing 100 pounds occasionally and lift and carry up to 100 pounds occasionally. The job analysis form provides that "occasionally" means the person does the activity up to 33% of the time, that "frequently" means the person does the activity 34% to 66% of the time and that "continuously" means the person does the activity 67% to 100% of the time.

In connection with her application for benefits, plaintiff submitted a statement from attending physician Anderson, dated September 16, 1999. The statement indicated that, as of April 19, 1999, plaintiff's symptoms were "back pain radiating down" and that plaintiff's work worsened her condition.

#### 3. *Other evidence considered by defendant*

In addition to reviewing plaintiff's submitted materials, defendant collected information by telephone calls. Prior to making a decision to grant disability benefits, defendant was aware that plaintiff and her husband owned two taverns, Tim & Sandy's Sports Bar, located in Ashland, Wisconsin, and Stagger Inn, located in Grandview, Wisconsin, which is south of Ashland.

On November 19, 1999, a representative from UNUM made a phone call to plaintiff. In the telephone conversation, plaintiff informed defendant that her typical

day consists of "going for walks, doing the books for the bar and performing household chores." Asked about her work at the bars she owns with her husband, plaintiff stated that she does not bartend or cook but only does the bars' food ordering and bookkeeping. The representative also spoke with Lulich, who stated that, as far as she knew plaintiff did "all kinds of work there [at the taverns]—bartend, cook, etc."

Defendant did not ask plaintiff to confirm Lulich's belief, but instead informed plaintiff that it required additional information regarding her restrictions and limitations and the requirements of her occupation before it could fully evaluate her claim for long-term disability benefits. Simultaneously, defendant requested that Callahan provide all plaintiff's medical records from May 1, 1999. Callahan sent defendant a history of treatment record, which included records of plaintiff's visits on May 25, August 30, November 9 and November 30, 1999, and an operative report of a surgery on September 21, 1999. With regard to her post operative restrictions, Callahan stated in the record of her visit on August 30, 1999:

> She would have to be braced in a TLSO brace for between three to six months. She would have to be off work from her job as a cook at the hospital for at least six months and off of her position in the restaurant that she owns.

On December 17, 1999, defendant conducted an in-house medical review and noted that if plaintiff's activity appeared to be outside her restrictions and limitations, it would consider conducting an activity check. On January 4, 2000, defendant granted plaintiff's application for long-term disability benefits. The benefits were calculated back to her entitlement date of August 22, 1999. Defendant informed plaintiff that in order to qualify for ongoing benefits, she would have to continue to meet the definition of disability under the policy.

### C. Discontinuance of Benefits

On January 12 and 13, 2000, Michael O'Brien, defendant's field agent, conducted interviews with plaintiff. During the interview, plaintiff stated that she spent an hour a day at each tavern and she limited her activities at both bars. She also stated that she had hired people to run the bars and that she had started doing the books, ordering and banking.

From January 28 through January 30, 2000, defendant conducted surveillance to determine whether plaintiff's activities were consistent with her work restrictions and her complaints. On the evening of January 28, 2000, at the Stagger Inn, plaintiff was videotaped in segments for approximately 55 minutes "bending, twisting, standing for long periods of time, carrying a food order, walking, and conversing with several unidentified individuals."

On the afternoon of January 29, 2000, at the Stagger Inn, the investigation team observed that she was "bending over the counter, sitting, standing for long periods of time and conversing with several unidentified individuals." Defendant's agent overheard plaintiff talking about preparing party trays for the Super Bowl party and preparing food for Mexican dinner night at Tim & Sandy's Sports Bar. Plaintiff received food orders from several customers. During that time, she was seen "bending, lifting, carrying, standing, walking and entering and exiting the kitchen." The team also observed plaintiff wearing green latex gloves, which indicated to them that she was washing dishes.

On January 30, 2000, at Tim & Sandy's Sports Bar, the investigation team obtained a videotape of plaintiff as she parked the vehicle in the parking lot and unloaded several food trays from the rear of the vehicle. During that time, she could

be seen bending, lifting, carrying and walking. She was also seen to exit the establishment carrying an unidentified item and placing the item into the rear of the vehicle.

The surveillance report produced on January 31, 2000 summarized the surveillance:

> [W]e obtained videotape of her engaged in physical activities including walking, bending, lifting, carrying, twisting, standing for long periods of time, entering and exiting a vehicle and driving in a normal, unrestricted fashion. She does not appear to be physically handicapped or disabled nor does she wear any visible back brace or cervical collar. She does not utilize the support of a cane while moving about.

On February 6, 2000, O'Brien authored a follow-up field referral report, in which he noted:

> The information developed and recorded shows that the insured spends a great deal more time at the taverns than she reported to me. She also does more work at the Stagger Inn than she reported. (It was reported to me that she took the food order from one surveillance team and served a round of drinks to them on Saturday night.) She was not seen bartending, but was seen coming and going from the kitchen area and wearing an apron and gloves. She was also on her feet more than she admitted to as seen on tape standing and talking to customers while her husband did the bartending.

As of February 22, 2000, defendant discontinued plaintiff's long-term disability benefits. In the notification letter sent to plaintiff dated March 29, 2000, defendant pointed out that according to the medical information in its file, "your attending physicians indicate that you are restricted from working in your occupation as a 36 hour per week food service worker/cook due to the following restrictions and limitations: no frequent or continuous stand/walk; no heavy lifting; and no push/pull." Defendant also noted that plaintiff's representation that her duties at the bars were only bookkeeping and accounting were false. Defendant concluded that the information from the surveillance contradicted plaintiff's reported difficulties in lifting, bending and carrying due to the weakness in her back that she communicated to defendant in the previous telephone interview and personal visit interview. As a result, defendant determined that plaintiff did not meet the definition of disability under the policy and that no further benefits were due.

## OPINION

### A. ERISA Standard of Review

The Employee Retirement Income Security Act applies to "any plan, fund or program which was heretofore and hereinafter established or maintained by an employer or employer organization or both." 29 U.S.C. § 1002(I). The parties agree that defendant's plan is governed by ERISA. In addition, the parties recognize that the standard of review in this case is the deferential "arbitrary and capricious" standard because the plan gives defendant discretionary authority to determine eligibility for benefits or to construe the benefits of the plan. See Firestone Rubber v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); see also O'Reilly v. Hartford Life & Accident Insurance Company, 272 F.3d 955 (7th Cir.2001). Under this standard, the Court of Appeals for the Seventh Circuit limits the scope of review to the record available to the plan administrator at the time the decision was made. See, e.g., Donato v. Metropolitan Life Insurance Co., 19 F.3d 375, 380 (7th Cir. 1994); Smart v. State Farm Ins. Co., 868 F.2d 929, 936 (7th Cir.1989).

A decision is arbitrary or capricious when the decision maker "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to difference in view or the product of ... expertise." *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985) (citing *Motor Vehicle Manufacturers' Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "The arbitrary and capricious standard does not require the committee's decision to be the only sensible interpretation of a plan, so long as its decision 'offer[s] a reasoned explanation, based on the evidence, for a particular outcome.'" *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 279–80 (7th Cir.1994) (quoting *Pokratz*, 771 F.2d at 209). Under this standard of review, a court should consider the following factors: "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir.1995).

### C. *Termination of Disability Benefits*

In deciding whether to terminate plaintiff's benefits, the issue before defendant was whether plaintiff was "limited from performing the material act and substantial duties of [her] regular occupation due to [her] sickness or injury." In support of its argument that plaintiff was not so limited, defendant relies on its video surveillance, which shows that plaintiff could stand, walk and lift trays, among other things. It cites several cases from this circuit that it believes provide support for its decision. *See O'Reilly v. Hartford Life & Accident Insurance Co.*, 272 F.3d 955 (7th Cir.2001); *Hightshue v. AIG Life Insurance Co.*, 135 F.3d 1144 (7th Cir. 1998); *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375 (7th Cir.1994); *Pokratz v. Jones Dairy Farm*, 771 F.2d 206 (7th Cir.1985). In each case, the court of appeals concluded that the administrator's decision to deny benefits was not arbitrary and capricious.

Defendant's reliance on these cases is misplaced because the facts in each are materially dissimilar from those in this case. Perhaps the most noticeable difference is that in each of those cases, the defendant had supported its decision with opinions by medical or vocational experts. *O'Reilly*, 272 F.3d at 963 (vocational expert supplied "quite detailed" reports that included "specific information about Mr. O'Reilly's abilities and limitation"); *Hightshue*, 135 F.3d at 1148 (internist and allergy medical specialist reviewed plaintiff's medical records collected from at least seven different medical care providers); *Donato*, 19 F.3d at 377 (review of medical records by "a roundtable of physicians and a board-certified allergist-immunologist"); *Pokratz*, 771 F.2d at 208 (two different vocational evaluations and psychiatrist's diagnosis). By contrast, in this case, defendant did not support its decision with any opinions by a vocational or medical expert. Rather, the only medical evidence available was the conclusion by plaintiff's physician that she would be unable to perform for *at least* six months after her surgery.

The Court of Appeals for the Seventh Circuit has not held that a decision to deny benefits is always irrational simply because a defendant failed to obtain a medical opinion. Certainly, in some circumstances an applicant's failure to meet the definition of "disabled" is so apparent that video surveillance alone would be suffi-

cient. For example, the question in *O'Reilly, Hightshue*, and *Pokratz* was whether the evidence supported a conclusion that the plaintiff was "totally disabled" within the meaning of the plan. In other words, the question was whether there was *any* occupation for which the plaintiff was qualified that she could perform. If that were the question in this case, I would agree with defendant that the videotape proved that plaintiff was not so disabled. However, under the plan in this case, to meet the definition of "disabled" plaintiff had to show only that she was unable to perform *her* occupation. It is undisputed that the requirements of plaintiff's occupation included standing continuously, pushing and pulling food carts and boxes that weighed up to 100 pounds and lifting and carrying items that weighed up to 100 pounds. The video tape made by defendant does not show plaintiff engaging in any of these activities. Rather, it shows her standing while leaning against a bar for up to one hour and carrying items of unknown weight, but certainly much less than 100 pounds. Thus, the videotape, standing alone, did not provide defendant with "enough evidence to allow [it] to make a reasonable decision." *O'Reilly,* 272 F.3d at 961; *see also Patterson v. Caterpillar, Inc.,* 70 F.3d 503 (7th Cir.1995) (upholding denial of benefits when defendant based decision on video surveillance *and* examination by physician).

Defendant makes much of the fact that the videotape was inconsistent with plaintiff's earlier representations. However, the discrepancies are not as prominent as defendant suggests. In the January 31, 2000 surveillance report, it is noted that plaintiff was not wearing a back brace or cervical collar and that she did not use a cane when walking. But plaintiff never represented that she was disabled to this extent. Rather, she told an UNUM representative that she often went for walks and performed household chores. Furthermore, plaintiff's doctors never suggested that plaintiff was a complete invalid; they stated only that many of plaintiff's duties at her job exacerbated her back and leg pain. They did not state that plaintiff was incapable of standing, walking or lifting *at all.* A conclusion that plaintiff should not spend the whole day on her feet is not inconsistent with evidence that plaintiff was able to stand (while leaning on a bar) for up to one hour.

It is true that plaintiff suggested to defendant that she limited her activities at the taverns to a greater extent than that evidenced by the videotape. However, the question for defendant to decide was not whether plaintiff was completely accurate in her representations but whether she could perform her job in fact. Defendant points to no authority that would permit it to deny benefits simply because it believed plaintiff's credibility was called into question.

I agree with defendant that the videotape suggests at least that plaintiff may have been recovering more quickly than anticipated by her doctors. After viewing the videotape, defendant would have been justified in requiring plaintiff to prove that she continued to be disabled. However, defendant erred in terminating benefits immediately without providing plaintiff any opportunity in which to rebut the inferences that defendant drew from the tape. This failure distinguishes this case from *McGarrah v. Hartford Life Insurance Co.,* 234 F.3d 1026 (8th Cir.2000), in which the court upheld a termination of benefits based on video surveillance. In *McGarrah,* the plaintiff was confronted with the videotape and failed to come forward with additional evidence supporting the disability claim. In this case, defendant provided plaintiff with no process, but instead terminated her benefits with no notice. That

decision was unreasonable. Accordingly, I conclude that plaintiff is entitled to summary judgment.

### D. *Remedy for ERISA Violation*

The only remaining issue is the appropriate remedy. Although neither party has briefed the issue, the court of appeals recently discussed in depth when remand and reconsideration is appropriate and when a court should order retroactive reinstatement of benefits. *See Hackett v. Xerox Corporation Long–Term Disability Income Plan*, 315 F.3d 771, 775–77 (7th Cir.2003). The court stated that in determining the remedy in an ERISA case, a court should distinguish between an initial decision to deny benefits and a decision to terminate benefits an administrator granted an application for benefits. *Id.* at 775–76. The court explained that the remedy should return the plaintiff to the status quo at the time the defendant made its decision. *Id.* at 776. Thus, when a court concludes that a denial of an application for benefits was arbitrary and capricious because the process was inadequate, the proper remedy is to remand so that the defective procedure may be corrected. *Id.* "The fact that the plan administrator failed to provide the adequate procedures does not mean that the claimant is automatically entitled to benefits-such a holding might provide the claimant 'with an economic windfall should she be determined not disabled upon a proper reconsideration.'" *Id.* (quoting *Quinn v. Blue Cross and Blue Shield Association*, 161 F.3d 472, 478 (7th Cir.1998)).

However, when a court concludes that a decision to terminate benefits was defective, a return to the status quo would be a continuation of benefits from the time of termination. *Id.* In *Hackett*, the court concluded that "but for" the defendant's inadequate procedures, the plaintiff's benefits "would have been continued unaltered." *Id.*

■ Because this case involves a termination of benefits rather than a denial of an application, one reading of *Hackett* suggest that reinstatement rather than remand is the appropriate remedy. However, the reasoning in *Hackett* does not necessarily apply to this case. I cannot say that, had defendant provided plaintiff with sufficient process, it would have come to a different conclusion. The problem with defendant's decision was not that it was unequivocally wrong but rather that it was uninformed. As noted above, although the video surveillance was insufficient by itself to support termination of plaintiff's benefits, it did give defendant reason to suspect that plaintiff had recovered. Under the terms of the plan, defendant was entitled to require plaintiff to show that she continued to be disabled. Perhaps if it had done this, plaintiff would have been unable to meet the definition at that time. Thus, simply awarding reinstatement of benefits could in this case, as in *Quinn*, provide plaintiff with a windfall. Accordingly, I conclude that remand is the most appropriate remedy.

However, I am aware that a significant amount of time has passed since defendant terminated plaintiff's benefits. It could be difficult for plaintiff to accumulate evidence at this time regarding her condition three years ago. Because it was defendant's failure to provide sufficient process that necessitates further review, it would be unfair to require plaintiff to prove that she did in fact continue to meet the definition of "disabled" at the time defendant terminated her benefits. Therefore, at this point, I conclude that it is defendant's burden to show that plaintiff was *not* disabled within the meaning of the plan. If defendant is unable to come forward with further evidence supporting its position, then plaintiff's benefits should be reinstated retroactively.

I note that the definition of disability under the plan changes after a period of 24 months. Specifically, after that time, the question is whether an insured is "unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience." Thus, although the burden stays with defendant to show that plaintiff cannot meet this definition, defendant may certainly consider this changed definition in determining whether plaintiff is entitled to benefits after the first 24 months.

ORDER

IT IS ORDERED that

1. Defendant UNUM Life Insurance Company of America's motion for summary judgment is DENIED;

2. On the court's own motion, summary judgment is GRANTED in favor of plaintiff Sandra M. Mennenoh; and

3. The case is REMANDED to defendant to conduct a full and fair review of plaintiff's qualification for long term benefits and determine the appropriate amount of benefits due; defendant may have until August 25, 2003 to conduct the full and fair review and report its findings to this court; plaintiff may have until September 9, 2003, in which to advise the court whether she objects to the review process or defendant's benefit determination.