Michael B. SMITH and Colonial Mat
Company, Inc., Appellant–
Defendants,

v.

McLEOD DISTRIBUTING, INC.,
Appellee–Plaintiff.

No. 41A01–9911–CV–403.

Court of Appeals of Indiana.

Dec. 27, 2000.

C. Warren Nerz, McCrosson & Nerz, Indianapolis, Indiana, Attorney for Appellant.

Diane E. Bluhm, Morgan & Pottinger, P.S.C., Louisville, Kentucky, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Defendants, Colonial Mat Company, Inc. ("Colonial Mat") and Michael B. Smith, appeal the judgment entered against them for a commercial debt owed to Plaintiff, McLeod Distributing, Inc. ("McLeod"). McLeod cross-appeals from the trial court's decision to reduce the amount of

prejudgment interest awarded to it. We affirm in all respects.

### Issues

Colonial Mat and Smith have presented three issues for review, which we consolidate into two issues restated as follows:

I. whether the trial court erroneously concluded that Colonial Mat was a proper party to this action because the commercial invoices at issue were directed to "Colonial Carpets, Inc."; and

II. whether the personal guarantee executed by Smith in order to establish a line of credit for Colonial Mat with McLeod was invalid due to improper execution.

McLeod's sole issue on cross-appeal is whether the trial court erred in reducing the amount of prejudgment interest awarded to McLeod because the record reflects little or no activity in the prosecution of this case for several years.

### Facts

McLeod was a corporation involved in the wholesale distribution of floor coverings, including carpets. It appears from the evidence that Colonial Mat installed carpets and other floor products in residences and other locations; it was incorporated in 1987. Colonial Industrial Products Company, Inc., ("Colonial Industrial") was incorporated in 1981. At the time Colonial Mat was incorporated, Colonial Industrial was distributing a certain brand of industrial rubber products. A few months after Colonial Mat was incorporated, it applied for a line of credit with McLeod. McLeod initially refused to ship goods to Colonial Mat on credit, but eventually approved a line of credit for Colonial Mat after Smith, the president of both Colonial Mat and Colonial Industrial, signed a personal guarantee for any debt Colonial Mat might incur.

After McLeod and Colonial Mat had been doing business for nearly one-and-a-half years, Smith sent the following letter to McLeod, which we reprint in its entirety:

March 17, 1989

To: Carpet Suppliers

Re: Colonial Carpets

Dear Supplier,

In the near future we will be selling our matting products under the name of "Logomatts of America". We are obtaining licensing for custom logo mats from several universities and companies. For marketing reasons we feel a need for a name change.

However, we will be registering "Colonial Carpets" to the corporation that we sell floor products under. We presently use "Colonial Carpets" as the name we invoice our carpet jobs.

So, as soon as our printing is completed we will be ordering, as well as selling, all floor products except Mats & Matting as "Colonial Carpets" a corporate division of Colonial Industrial Products Co., Inc. If you have any questions, feel free to call me at any time.

Very truly yours,

Michael B. Smith

President

Record p. 201. On March 27, 1989, Colonial Industrial filed a certificate of assumed name with the Secretary of State, indicating that it would be doing business as Colonial Carpets. After receiving this letter, McLeod changed Colonial Mat's name on its computer billing system to "Colonial Carpets, Inc." It never closed the account originally opened by Colonial Mat, however, and neither Smith nor anyone associated with his businesses did so.

McLeod continued doing business with Colonial Industrial d/b/a Colonial Carpets until February and March of 1990, when several invoices for goods delivered went unpaid. The total unpaid balance accrued to $6,132.65 as of May 11, 1990, when demand for payment was made, and McLeod filed a complaint against Colonial Mat and Smith on September 20, 1990. Colonial Mat's corporate existence contin-

ued until November 1990, when the Secretary of State administratively dissolved it because of its failure to file an annual report.

After this case remained pending for nearly ten years, the trial court conducted a bench trial and entered judgment in favor of McLeod for the outstanding debt, plus eighteen percent prejudgment interest, eight percent postjudgment interest, and attorney and filing fees. However, the trial court reduced the prejudgment interest amount by $5,519.39, representing a period of approximately five years. After the trial court denied Colonial Mat's and Smith's motion to correct errors, this appeal ensued.

### Analysis

■ No party to this action requested special findings of fact, and the trial court did not enter any such findings sua sponte; thus, Colonial Mat and Smith are appealing from a general judgment, and the standard of review for such judgments is applicable. *Shelby Engineering Co., Inc. v. Action Steel Supply, Inc.,* 707 N.E.2d 1026, 1027 (Ind.Ct.App.1999). A general judgment will be affirmed if it can be sustained upon any legal theory consistent with the evidence. *Id.* In making this determination we neither reweigh the evidence nor judge the credibility of witnesses; rather, we consider only the evidence most favorable to the judgment together with all reasonable inferences to be drawn therefrom. *Id.* In reviewing a general judgment, we must presume that the trial court correctly followed the law. *Perdue Farms, Inc. v. Pryor,* 683 N.E.2d 239, 240 (Ind.1997).

### I. Liability of Colonial Mat

Colonial Mat argues that it was not a proper party to this suit because it is undisputed that all of the invoices at issue were addressed to "Colonial Carpets, Inc.," which Colonial Mat claims was a distinct corporate entity. It also claims that McLeod had notice before these invoices were issued, via the March 17, 1989,

letter, that Colonial Mat and Colonial Industrial d/b/a Colonial Carpets were separate companies. McLeod essentially responds that it would be inequitable not to hold Colonial Mat liable for this debt because Colonial Mat and Colonial Carpets were indistinguishable entities. In order to conclude that Colonial Mat was a proper party to this action, the trial court would have been required to conclude that Colonial Industrial d/b/a Colonial Carpets was merely an adjunct to or alter ego of Colonial Mat, which could be properly held liable for a debt incurred by Colonial Industrial.

■ Although Indiana courts are reluctant to disregard a corporate entity, they may do so to prevent fraud or unfairness to third parties. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1232 (Ind.1994). "When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry." *Id.* Therefore, we will give deference to a trial court's decision to pierce the corporate veil or disregard the fiction of a separate corporate entity. That fiction may be disregarded where one corporation is so organized and controlled and its affairs so conducted that it is a mere instrumentality or adjunct of another corporation. *Extra Energy Coal Co. v. Diamond Energy & Resources, Inc.,* 467 N.E.2d 439, 441 (Ind.Ct.App.1984). "Indiana courts refuse to recognize corporations as separate entities where the facts establish several corporations are acting as the same entity." *General Finance Corp. v. Skinner,* 426 N.E.2d 77, 84 (Ind.Ct.App.1981). "While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted." *Stacey–Rand, Inc. v. J.J. Holman, Inc.,* 527 N.E.2d 726, 728 (Ind.Ct.App.1988). Our supreme court has held that the burden of proof with respect to piercing the corporate veil rests with the plaintiff, and that

in deciding whether the plaintiff has met this burden:

> an Indiana court considers whether the plaintiff has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson v. Price,* 644 N.E.2d 864, 867 (Ind.1994).

 However, *Aronson* specifically concerned piercing the corporate veil in order to hold a shareholder personally liable for a corporate debt; our supreme court was not asked in that case to hold one corporation liable for another closely related corporation's debt. We do not believe the eight *Aronson* factors were intended to be exclusive, particularly when a court is asked to decide whether two or more affiliated corporations should be treated as a single entity. In fact, Indiana courts (in cases cited by *Aronson*) have often evaluated additional factors in such a situation, factors that would not be applicable where one was attempting to pierce the corporate veil to hold a corporation's directors, officers, or shareholders personally liable for a corporate debt.[1] Some of these factors have included whether similar corporate names were used, *see Extra Energy Coal Co.,* 467 N.E.2d at 442; *Clarke Auto Co. v. Fyffe,* 124 Ind.App. 222, 227–30, 116 N.E.2d 532, 535–36 (1954); whether there were common principal corporate officers, directors, and employees, *see Stacey–Rand, Inc.,* 527 N.E.2d at 728–29 (Ind.Ct.App.1988); whether the business purposes of the corporations were similar, *see Extra Energy Coal Co.,* 467 N.E.2d at 441; and whether the corporations were located in the same offices and used the same telephone numbers and business cards, *see id.* Additionally, we have previously noted that other jurisdictions have disregarded the separateness of affiliated corporations when the corporations are not operated as separate entities but are manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud, or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. *Eden United, Inc. v. Short,* 573 N.E.2d 920, 933 (Ind.Ct.App. 1991), *trans. denied.* Indicia of common "identity," "excessive fragmentation," or "single business enterprise" corporations may include, among other factors, the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public. *Id.*

 McLeod failed to present much evidence relevant to the *Aronson* factors in support of its claim; it presented no evidence of undercapitalization, fraud,

---

1. We also note that the record here does not permit us to evaluate whether Colonial Mat and Colonial Industrial were ever in a parent-subsidiary relationship, and so the "control" theory of piercing a subsidiary's corporate veil to hold a dominating parent company liable for the subsidiary's debt is also inapplicable here. However, we have previously approved piercing of a corporation's veil in order to reach the assets of a so-called "brother-sister" corporation. *See Eden United, Inc. v. Short,* 573 N.E.2d 920, 933–34 (Ind.Ct.App. 1991), *trans. denied.*

Additionally, we observe that the reasons given by the *Aronson* court for the limited liability of corporate shareholders are inapplicable in the "brother-sister" corporation context. Those reasons include furthering capital formation by encouraging shareholders to invest through limiting their liability, as a means of encouraging the small-scale entrepreneur and of keeping entry into business markets competitive and democratic. *Aronson,* 644 N.E.2d at 867 (citing Stephen B. Presser, *Thwarting the Killing of the Corporation: Limited Liability, Democracy, and Economics,* 87 Nw. U.L.Rev. 148, 155 (1992)).

absence of corporate records, failure to observe formalities, or shareholder misconduct, for example. Nonetheless, we believe there was sufficient evidence presented from which the trial court might have concluded that Colonial Mat and Colonial Industrial were effectively one and the same corporation, thus justifying a holding that Colonial Industrial was merely an adjunct to or alter ego of Colonial Mat, which is liable for this debt.

First, we note the obvious similarity between the names of the two companies. "Colonial" was apparently used by Smith at the time to identify his businesses generally;[2] the business card that McLeod introduced into evidence had in one corner "Colonial Mat Co., Inc.," and in the opposite corner was simply "Colonial." Second, Colonial Mat and Colonial Industrial d/b/a Colonial Carpets were engaged in virtually identical lines of business. Colonial Industrial's Articles of Incorporation indicated its purpose was "to engage in the sales and distribution of industrial products," Record p. 313, while Colonial Mat's purpose was "to engage in the sale, distribution and services related to industrial products including, but not limited to, floor covering products ..." Record p. 299. The only apparent difference between Colonial Mat and Colonial Industrial d/b/a Colonial Carpets was that Colonial Mat dealt in all floor coverings, while Colonial Industrial dealt in all floor coverings except mats. Third, Smith was president of both Colonial Mat and Colonial Industrial; the only other director for both corporations was the same individual, the treasurer Joe Eller. The two companies also shared the same office manager, Lois Jean Bennett, who testified that she was the only office personnel Smith had at the time. Fourth, the two companies operated at the same address and used an identical phone number. Fifth, while not of major importance, we find it interesting that Colonial Mat's credit application states that it had been in business since 1970. Given that Colonial

Mat was incorporated in 1987, it would appear to be reasonable to infer that Smith was referring to 1970 as the date when he, personally, went into business.

Sixth, there is evidence from which a fact finder could have reasonably inferred that Colonial Mat and Colonial Industrial intermingled their assets, or that Colonial Mat paid for obligations of Colonial Industrial, which would satisfy two of the *Aronson* factors. McLeod introduced certain invoices directed to Colonial Mat that were paid by Colonial Mat checks following the March 17, 1989, letter that Colonial Mat and Smith claims gave notice of a change in corporate structure. We understand that a corporation that is going out of business will have a period of "winding up," where it will pay debts incurred before it went out of business. However, included among those invoices, for example, was an order for 500 business cards placed on March 23, 1989, paid for with a Colonial Mat check. It would seem unusual for a company going out of business to order 500 business cards; a reasonable inference would be that this represented some of the "printing" referred to in the March 17, 1989, letter, and that it was paid for out of Colonial Mat's checking account. The record also contains several payroll checks to Smith and Bennett written on Colonial Mat checks in April of 1989, as well as a Colonial Mat check written to McLeod itself in May of 1989. Finally, we address Smith's and Colonial Mat's claim that "[i]t is undisputed that by letter dated March 17, 1989, Michael B. Smith served notice upon McLeod that its carpet business would be affected by a corporate change." Appellant's Brief p. 7. We find this to be far from undisputed; rather, the letter is ambiguous in this regard. First, the letter at no point states that Colonial Mat is going out of business, and in fact makes no mention of Colonial Mat at all. It can be argued that it refers to Colonial Mat inferentially by stating, "we will be registering 'Colonial Carpets' to the corpo-

---

**2.** He now owns a company called "Custom Mat Company." Record p. 287.

ration that we sell floor products under." Record p. 201. That corporation was Colonial Mat, and thus this sentence may have indicated "Colonial Carpets" was going to be "registered" to Colonial Mat, thus lending support to the idea that Colonial Carpets and Colonial Mat were one and the same. The letter also states that the change to Colonial Carpets was a name change made for marketing reasons. Ron McLeod, McLeod's president, testified that this indicated to him that the name change "was a marketing thing that had no bearing on anything else.... It didn't change the company, it just had another name.... It was just all the same stuff." Record pp. 196–99. McLeod also testified that the meaning of the letter to him was "they are adding a name to their Colonial Industrial Products Company, Inc. a company called Colonial Carpets." Record p. 205. Thus, far from providing clear and unambiguous notice of a change in corporate structure, the letter appears to have only added to the confusion about the purported corporate separateness of Colonial Mat and Colonial Industrial d/b/a Colonial Carpets.

Upon review of the evidence, we cannot say that it leads solely to a result contrary to that reached by the trial court. There is ample indication that, in dealing with the public, Smith treated Colonial Mat and Colonial Industrial d/b/a Colonial Carpets as if they were adjunct corporations, or mere alter egos or instrumentalities of each other that shared a common identity. Therefore, equity requires that Colonial Mat be held liable for the debt at issue here in order to protect an innocent third party, McLeod, from unfairness.

## II. Personal Liability of Smith

Smith's liability in this matter is based upon a personal guarantee he executed at the time Colonial Mat applied for a line of credit with McLeod; there is no argument that Smith is personally liable, as an officer, director, or shareholder, under a piercing the corporate veil theory. Smith's first argument regarding his personal liability is that he never guaranteed the debts of Colonial Industrial d/b/a Colonial Carpets, only Colonial Mat, and thus he cannot be liable in this case because the invoices at issue were directed to "Colonial Carpets." However, having resolved that Colonial Industrial was merely an adjunct to or alter ego of Colonial Mat, and that Colonial Mat may be liable for Colonial Industrial's debts, this argument has been effectively rendered moot because Smith did purportedly guarantee any debt Colonial Mat might incur to McLeod.

■ We turn to Smith's second argument, namely that his personal guarantee of Colonial Mat's debt is invalid because it was not properly executed. In Indiana, three parties are required to properly execute a continuing guarantee agreement: the obligor, the obligee, and the surety or guarantor. *Kordick v. Merchants Nat. Bank & Trust Co.*, 496 N.E.2d 119, 123–24 (Ind.Ct.App.1986).[3] Smith claims that the McLeod sales representative who signed the Colonial Mat credit application, which also contained the personal guarantee, was not an authorized representative of McLeod, the obligee, and thus the guarantee is ineffective.

■ Even though we assume without deciding that the guarantee was improperly executed, we disagree that the guarantee is ineffective. The law applicable to guarantee agreements is governed by the general law of contracts. *Bickel v. Deitch*, 532 N.E.2d 617, 618 (Ind.Ct.App. 1989), *trans. denied.* That being the case, we believe that the contract law principle of ratification is applicable here. "Ratification applies when a party to a contract, with knowledge of facts entitling that party to rescind the contract, treats the contract as a continuing and valid obligation, thus leading the other party to believe that

---

**3.** Because the continuing guarantee signed by Smith is not a draft, a check, a certificate of deposit, or a note, it is not governed by the rules of the Indiana Uniform Commercial Code. See *Kordick*, 496 N.E.2d at 123.

the contract is still in effect." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1236 n. 6 (Ind.1994).

██ Before the disputed invoices in this case were issued in the early part of 1990, McLeod and Colonial Mat had been doing business pursuant to Colonial Mat's line of credit that it applied for in August of 1987. Ron McLeod made it clear in his trial testimony that Colonial Mat's credit application was initially inadequate, based upon a review of Colonial Mat's finances, and its line of credit was approved only after review of Smith's personal finances and his personal guarantee of any debt Colonial Mat might incur. Thus, Smith's guarantee was an integral condition precedent to McLeod's agreeing to ship goods to Colonial Mat on credit, and McLeod did in fact ship goods to Colonial Mat on credit for nearly two and a half years in reliance upon the personal guarantee. At no time did Smith seek to rescind the guarantee. We believe it is clear that Smith had knowledge of the fact that would permit him to rescind the guarantee (the faulty execution) but he did not do so, perhaps because his companies, Colonial Mat and its alter ego Colonial Industrial d/b/a Colonial Carpets, received the benefit of doing business with McLeod on credit because of the guarantee. McLeod had no reason to believe that Smith considered the guarantee ineffective.

### III. Cross Appeal: Reduction of Prejudgment Interest Award

In its appellate brief, McLeod raises a cross-appeal concerning the amount of prejudgment interest awarded to it by the trial court. Specifically, it attacks the trial court's decision to reduce the prejudgment interest award by $5,519.39 based upon "an approximate five (5) year period with little or no activity by Plaintiff in pursuit of prosecution of this case." Record p. 19. McLeod claims that "[t]here is no evidence that any gap in activity in this case is attributable solely to the Appellee." Appellee's Brief p. 7. The approximate five-year period of no activity referred to by the trial court appears to be from November 1992, when a pre-trial conference was apparently held, to March 1997, when McLeod moved to refer this case to mediation. The only activity during that period was the trial court's 1994 sua sponte motion to involuntarily dismiss the case pursuant to Indiana Trial Rule 41(E) and McLeod's response to that motion.

██ Although not raised by Colonial Mat and Smith, we believe it is clear that McLeod has waived appellate review of this alleged error. A party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct. *Stolberg v. Stolberg*, 538 N.E.2d 1, 5 (Ind. Ct.App.1989). Invited error is not subject to review by this court. *Id.* At the closing of this bench trial, the trial court specifically asked McLeod's counsel to address the gap in activity in this case and its potential effect on a prejudgment interest award. Counsel replied in part, "you are correct it is within your discretion as far as how much of that interest to award.... But I will agree though that probably in the entire ten years this has been going on, equity would not call for interest during the entire period. But I don't think wiping it away for the entire period would be correct either." Record pp. 543–44. Based upon these statements, McLeod cannot now complain that the reduction in prejudgment interest "was in error, contrary to law, and cannot be supported by any valid legal theory." Appellee's Brief p. 7. We also observe that McLeod does not argue on appeal that the amount of reduction was excessive or more than it had in mind, but only that any reduction at all was erroneous. As requested by McLeod's counsel, the trial court did not entirely "wipe away" the prejudgment interest award and McLeod is still entitled to interest for an approximate five-year period, representing delays in this ten-year-old case that the trial court apparently did not attribute to McLeod.

## Conclusion

We hold that there was sufficient evidence supporting the trial court's exercise of its equitable power to conclude that the fiction of corporate separateness should be disregarded in this case, and that Colonial Mat may be held liable for the debt of Colonial Industrial d/b/a Colonial Carpets at issue here. We also hold that Smith ratified his personal guarantee of Colonial Mat's debt to McLeod, even if it had been improperly executed. Finally, we hold on McLeod's cross-appeal that it invited any error with respect to the reduction of its prejudgment interest award.

Affirmed.

BAILEY, J., and RILEY, J., concur.