CONTINENTAL CASUALTY
COMPANY, Plaintiff–
Appellee,

v.

Alan SYMONS, et al., Defendants–
Appellants.

Nos. 14–2665, 14–2671, 15–1061.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 2015.

Decided March 22, 2016.

Samuel J. Thomas, Attorney, Bressler, Amery & Ross, P.C., Morristown, NJ, for Plaintiff–Appellee.

Arend J. Abel, Attorney, Cohen & Malad, Indianapolis, IN, for Defendant–Appellant.

Before ROVNER and SYKES, Circuit Judges, and ANDREA WOOD, District Judge.*

SYKES, Circuit Judge.

IGF Insurance Company owed Continental Casualty Company more than $25

* Of the Northern District of Illinois, sitting by designation.

million for a crop-insurance business it bought in 1998. In 2002 IGF resold the business to Acceptance Insurance Company for about $40 million. Continental alleges that IGF's controlling family—Gordon, Alan, and Doug Symons—structured the sale so that most of the purchase price was siphoned into the coffers of other Symons-controlled companies, rendering IGF insolvent. More specifically, Continental claims that $24 million of the $40 million purchase price went to three Symons-controlled companies—Goran Capital, Inc.; Symons International Group, Inc.; and Granite Reinsurance Co.—for sham noncompetition agreements and a superfluous and overpriced reinsurance treaty. Continental, still unpaid, sued for breach of contract and fraudulent transfer.

After lengthy motions litigation and a bench trial, the district court found for Continental and pierced the corporate veil to impose liability on the controlling companies and individuals. Continental's damages totaled $34.2 million, so the court entered judgment in that amount jointly and severally against IGF, Symons International, IGF Holdings, Inc., Goran, Granite Re, and Gordon and Alan Symons. (Gordon has since died; his estate was substituted for him. Doug Symons is in bankruptcy.)

Clearing away the factual complexity, this appeal presents three discrete questions for our review: (1) Is Symons International liable to Continental for breach of the 1998 sale agreement? (2) Are Symons International, Goran, Granite Re, Alan Symons, and the Estate of Gordon Symons liable as transferees under the Indiana Uniform False Transfer Act ("IUFTA")? and (3) Are Alan Symons and the Estate of Gordon Symons liable under an alter-ego theory? For the most part, we answer these questions "yes" and affirm the judgment in its entirety.

# I. Background

Like many fraudulent-transfer cases, this one comes to us with a long and complicated factual and procedural history. We'll try our best to simplify. In a nutshell, in February 1998 IGF bought a multi-peril crop-insurance business from Continental at a price to be determined at either side's option by the exercise of a put or call. In January 2001 Continental exercised its put option; under the contractual formula, IGF owed Continental $25.4 million. Around that same time, IGF decided to unload the business and eventually sold it to Acceptance Insurance Company for a total price of about $40 million. The Symons family insisted that the purchase price be structured as follows: $16.5 million to IGF; $9 million to IGF parent companies Symons International and Goran in exchange for noncompetition agreements; and $15 million to Granite Re, an affiliated Symons-controlled company, in exchange for a reinsurance treaty. Acceptance agreed to this arrangement. The key questions in this protracted litigation are whether the payments to Symons International, Goran, and Granite Re were fraudulent transfers undertaken to evade IGF's debt to Continental, and if so, which entities and persons may be held liable.

## A. Corporate Structure

The Symons family ran a multinational insurance empire. On paper it stretched from Canada to Barbados, but in reality the companies were all interrelated and operated out of Indianapolis. Business was done through a complex web of parents, subsidiaries, and operating and holding companies, all of which facilitated the easy—but circuitous—flow of money. It was at bottom a Symons-run family business with interlocking equity, boards, and

officers, all designed to keep the companies firmly under the family's control.

Many components of the Symons family empire were involved in this litigation at its inception and through trial. The issues on appeal, however, concern only Symons International, Goran, Granite Re, Alan Symons, and the Estate of the late Gordon Symons.

Gordon Symons (Lord of Whitehouses, Nottinghamshire, U.K.) founded the family business in the 1970s. At the time of the events at issue in this suit, the business was run by Gordon's sons Alan and Doug. (Doug filed for bankruptcy while the suit was ongoing; the proceedings against him were stayed.)

Together the Symons family owned 50.4% of Goran, while its officers owned 1.8% and the rest was publicly traded. Goran, in turn, owned 73.1% of Symons International (the rest was also publicly traded) and 100% of Granite Re, which existed to reinsure contracts from other Symons subsidiaries (e.g., Pafco General Insurance Company, Superior Insurance Company, and IGF) as well as third parties. Symons International, for its part, owned 100% of IGF Holdings, Inc., which in turn owned all of IGF.

All told, the Symons family directly or indirectly owned a majority stock interest in Goran, Symons International, IGF, and IGF Holdings. Gordon Symons was Chairman of Goran and all its subsidiaries; he was also President and CEO of Granite Re. During the relevant time period, Alan Symons was President and CEO of Goran; Vice Chairman and CEO of Symons International; Vice Chairman of Granite Re; President and CEO of Superior; and Vice Chairman of IGF and IGF Holdings. He was also a member of all the relevant boards. Doug Symons was Executive Vice President and Chief Operating Officer of Goran; President, CEO, and COO of Symons International; Vice Chairman, Executive VP, and Secretary of IGF Holdings; CEO and Secretary of IGF; Vice Chairman of Granite Re; and was on all the relevant boards. Indeed, at all times the Symons family held a controlling majority of the boards of IGF Holdings and IGF. The Granite Re board consisted of Symons family members, a family associate, and one independent director. Members of the Symons family and three others were also members of Goran's board of directors, with Gordon Symons as Chairman breaking any ties. Commingling of officers and directors in the Goran-affiliated group of corporations was rampant. All this is to say that the Symons family ran the entire show.

At the time of the events at issue here, the Goran constellation of corporations was also undercapitalized. The district court found that Goran and Symons International were balance-sheet insolvent in 1999, 2000, 2001, and 2002. IGF managed to keep its head above water, but when the debt to Continental was factored in, it too was insolvent.

At the same time, Symons family members were well compensated in salaries, consulting fees, and loans from the family companies. Alan, Doug, and Gordon each received large sums of money through unsecured, interest-free loans from Symons-family entities. Between 1999 and 2002, outstanding insider loans ranged from $2 million to more than $8 million; at the end of 2001, the total amount due from directors and officers was $12.6 million. The businesses also supplied security for outside loans to Symons family members— for example, Alan and Doug personally received more than $2.5 million in loans from Huntington Bank secured by preferred shares of Symons International held by Granite Re. More straightforwardly, between 1998 and 2002, each member of

the Symons family collected more than $2 million in salary and consulting fees from Granite Re, Goran, and Symons International.

The Symons businesses observed corporate formalities only in their most basic sense. Each was separately incorporated, had its own board, and maintained its own bank account. At the same time, however, all mail went to a single location, and concurrent board meetings were the norm, especially between Goran and Symons International.

### B. Crop Insurance

With the corporate background now in place, we proceed to the transactional facts of the case. The story begins 18 years ago with a deal over Continental's crop-insurance business.

On February 28, 1998, Continental entered into a "Strategic Alliance Agreement" with IGF, IGF Holdings, and Symons International pursuant to which Continental sold its crop-insurance business to IGF at a future price to be determined by a complex put/call formula. Until Continental exercised its option, the IGF side of the deal promised to pay Continental a portion of the profits from the pooled crop-insurance business.

Continental exercised its put on January 3, 2001. Under the formula specified in the agreement, the IGF side owed Continental $25.4 million. At the time IGF also owed Continental more than $4 million in shared profits. The IGF side did not pay.

Shortly before Continental exercised its option, IGF decided to sell the crop-insurance business. Three buyers expressed interest: Acceptance Insurance, Archer Daniels Midland (whose buyer consortium actually included Continental), and the Westfield Group. Westfield valued the book of business at approximately $40 million and wanted to pay in one check to IGF, but Alan Symons insisted that the purchase price be divided into separate payments to various Symons-controlled entities. Archer Daniels Midland also priced the business at about $40 million.

Acceptance too valued IGF's book of business at about $40 million, but unlike Westfield it was prepared to accept Alan's terms for how the purchase price would be structured and paid. Acceptance's chairman (and principal negotiator) put it this way: "We're willing to be as flexible as we can be, within regulatory constraints, in making the deal work for you and your companies." Alan Symons proposed the following payment structure: $9 million to Symons International and Goran for non-competition agreements; $15 million to Granite Re for a reinsurance treaty; and the remaining $16.5 million to IGF directly.

The noncompetition agreements lacked legitimate business justification. Neither Symons International nor Goran actually provided crop insurance; they're just holding companies. Most of the IGF employees who posed a real competitive threat to Acceptance—i.e., those with relationships to insurance agents and brokers—would be retained by Acceptance. Indeed, Acceptance paid a relatively modest $1.4 million to neutralize other competitive threats from the IGF employees with expertise in crop insurance (compared to the $9 million it paid ostensibly to keep the two holding companies at bay).

The Symons family—again, Alan in particular—also devised the reinsurance component of the deal and set the premium. The agreement called for Acceptance to pay Granite Re $6 million immediately and then $9 million over the next three years for "stop-loss" insurance. We'll provide more detail about this aspect of the transaction as needed later in this opinion.

Acceptance consented to these terms, and on May 23, 2001, entered into an agreement to purchase IGF's crop-insurance business for a total of $40.5 million, structured as described above.

## C. This Litigation

The IGF side actually commenced this litigation. On June 4, 2001—just after inking the deal with Acceptance—IGF, IGF Holdings, and Symons International filed suit in federal court alleging that Continental had misrepresented the profitability of the crop-insurance business. Continental responded on June 6 with a suit of its own for breach of contract based on the nonpayment of the $25.4 million purchase price for the business. The IGF/Acceptance deal closed later that same day.

The two actions were consolidated, and Continental eventually filed counterclaims for breach of contract and fraudulent transfer, adding Goran, Granite Re, Pafco, Superior, and Gordon, Alan, and Doug Symons as counterclaim defendants. As relevant here, Continental alleged that the counterclaim defendants breached the Strategic Alliance Agreement and fraudulently diverted IGF assets to Goran, Symons International, Granite Re, Pafco, and Superior. Continental also alleged that the Symonses and the interrelated corporate defendants should be held liable for the fraudulent transfer under an alter-ego theory.

After protracted discovery and motions proceedings, the district judge granted Continental's unopposed motion for summary judgment on all claims raised by the IGF side in the original suit. (That decision is not challenged here.) The parties then filed cross-motions for summary judgment on Continental's counterclaims. The judge granted summary judgment for Continental on the breach-of-contract claims and set the remainder of the case for trial.

After a lengthy bench trial, the judge entered a 136–page order finding for Continental on its fraudulent-transfer and alter-ego claims. After some posttrial skirmishes, judgment in the amount of $34.2 million was entered against Alan and Gordon Symons, IGF, IGF Holdings, Symons International, Goran, and Granite Re. As we've noted, Gordon Symons died while postjudgment proceedings were ongoing in the district court; his estate was substituted for him. This appeal followed.

## II. Discussion

Because the appeal concerns only Continental's counterclaims, the parties are inverted: Continental is now the plaintiff and the Symons-side parties are the defendants. The oversized briefs present a host of issues for our review. Distilling the arguments, we're essentially asked to decide whether the district judge got three main questions right: (1) Is Symons International an obligor on the Strategic Alliance Agreement and thus liable to Continental for breach? (2) Are the defendants liable as transferees under the Indiana Uniform False Transfer Act? and (3) Are the defendants liable under an alter-ego theory?

■ As always, we review the judge's legal conclusions de novo and his factual findings under the highly deferential clear-error standard. *Goodpaster v. City of Indianapolis,* 736 F.3d 1060, 1070 (7th Cir. 2013). Indiana substantive law applies. We find no error.

## A. Breach of Contract

■ There's no challenge to the judge's summary-judgment ruling that IGF and IGF Holdings breached the Strategic Alliance Agreement by failing to pay Conti-

nental what it was owed for the crop-insurance business. The only breach-of-contract issue raised on appeal is whether the judge correctly found Symons International liable for the breach as well.

Symons International relies on section 3.8.B of the Agreement, which describes the put mechanism and places the burden of payment squarely on IGF Holdings: "In the event [Continental] shall exercise the Put Mechanism, [IGF Holdings] shall be obligated to pay [Continental] an amount equal to 5.85 times the Average Pre–Tax Income as computed pursuant to this Section." But *three* Symons-family entities— IGF, IGF Holdings, and Symons International—were parties and signatories to the Agreement. And as the district court found, sections 6.8 and 11.1 of the Agreement combine to show that Symons International was clearly on the hook along with IGF and IGF Holdings.

Section 6.8, titled "Further Assurances," states as follows:

> *The parties hereto* shall use all commercially reasonable best efforts to take, or cause to be taken, all actions or to do, or cause to be done, all things or to execute any documents necessary, proper or advisable under applicable laws and regulations, to consummate and make effective the transactions contemplated by this Agreement. . . .

(Emphasis added.) Section 11.1, titled "Further Actions," reinforces the point:

> Each of *the parties hereto* agrees to use all reasonable effort to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all reasonable things necessary, proper or advisable to consummate the transactions contemplated by this Agreement. None of the parties hereto will take or permit to be taken any action that would be in breach of the terms or provisions of this Agreement or that would cause any of the representations contained herein to be or to become untrue.

(Emphasis added.)

Based on these clauses, the judge reasoned that Symons International, as a signatory to the Agreement (along with IGF and IGF Holdings), covenanted to do what was necessary to comply with the IGF side's contractual obligations and avoid a breach. This, in turn, makes it liable for any breach by IGF or IGF Holdings. *Cf. Hinc v. Lime–O–Sol Co.*, 382 F.3d 716, 721 (7th Cir.2004) (enforcing "best efforts" provisions under Indiana law).

Symons International protests that this makes it a guarantor and a proper guaranty needs to be explicit; here it is only implied. *See, e.g., Lind Stoneworks, Ltd. v. Top Surface, Inc.*, 194 Ohio App.3d 98, 954 N.E.2d 1256, 1262 (2011). Continental counters that Symons International is not a third-party guarantor but a necessary party to the Agreement, rendering it not so much a *guarantor* as an additional *obligor* under the Agreement.

We agree with Continental and find the judge's reasoning sound. While section 3.8.B, which describes the put mechanism, places the payment obligation on IGF Holdings, the "Further Assurances" and "Further Actions" clauses specifically refer to the obligations of the "parties hereto," which must include Symons International as a signatory to the Agreement. In these sections Symons International—the parent company of IGF Holdings—covenanted not to "take or permit to be taken any action that would be in breach" of the contract and agreed to "use commercially reasonable best efforts" and "all reasonable effort" to comply with the terms of the Agreement. The judge did not clearly err in finding Symons International liable as a co-obligor.

## B. The Indiana Uniform False Transfer Act

Moving beyond the contract claims, the judge found the defendants liable for fraudulent transfer under the Indiana Uniform Fraudulent Transfer Act, IND.CODE §§ 32–18–2–1 *et seq.* Broadly speaking, the IUFTA prevents a party from transferring assets in order to defraud a creditor. The question here is whether IGF's sale of the crop-insurance business was structured so as to fraudulently transfer assets in order to avoid paying Continental what it was owed.

### 1. *The IUFTA*

There are two possible grounds for liability under the IUFTA, and the judge found the defendants liable under both. The first—IUFTA § 14—requires a finding of actual *intent* to defraud, and the other—IUFTA § 15—covers transfers for less than reasonably equivalent value that leave the debtor insolvent, known as "constructive" fraudulent transfers.

We'll take the § 15 claim first. The statute states in relevant part:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

(1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(2) the debtor:

(A) was insolvent at that time; or

(B) became insolvent as a result of the transfer or obligation.

IND.CODE § 32–18–2–15.

Continental's claim arose before the sale to Acceptance closed on June 6, 2001, and the judge found that IGF was insolvent at the time of the sale. The dispute on appeal centers on whether IGF "receiv[ed] a reasonably equivalent value in exchange for the transfer." The judge concluded that it did not.

Recall that Acceptance was willing to pay $40.5 million for IGF's book of business, but IGF received only $16.5 million of the purchase price. The remainder was siphoned off to Goran and Symons International in exchange for non-competition agreements ($9 million) and to Granite Re for a reinsurance treaty ($15 million). The judge concluded that this was a diversion of purchase-money funds, leaving IGF with less than reasonably equivalent value. The judge found that the structure of the transaction—specifically, the sham noncompetes and overpriced reinsurance treaty—had been "proposed and driven" by Alan Symons on behalf of IGF. Acceptance, for its part, just wanted the crop-insurance business: It was happy to let Alan structure the sale however he wanted as long as the total price was around $40 million.

This way of structuring Acceptance's payment kept IGF from receiving reasonably equivalent value for the business. We'll explain in more detail later why we think the judge's findings regarding the noncompetes and reinsurance agreement were clearly correct. To assess liability under § 15, however, what matters is that IGF—Continental's debtor—received less than half the value of what it was selling, with the rest of the money going to Symons International, Goran, and Granite Re instead. The deal thus met all the elements of § 15: an open claim, insolvency, and a subvalue transfer.

Indeed, thanks largely to the same facts, the defendants fared no better under § 14. That section reads:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

*Id.* § 32–18–2–14.

In fraudulent-transfer cases under § 14, Indiana courts consult a list of factors known as the "badges of fraud" to determine whether the transfer was made with intent to defraud a creditor.[1] *See Otte v. Otte*, 655 N.E.2d 76, 81 (Ind.Ct. App.1995), *trans. denied.* "The existence of several of these badges may warrant an inference of fraudulent intent, but no particular badge constitutes fraudulent intent per se." *Hoesman v. Sheffler*, 886 N.E.2d 622, 630 (Ind.Ct.App.2008); *see also*

*Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703–04 (Ind.Ct.App. 2001) ("As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent." (quoting *Otte*, 655 N.E.2d at 81)).

Applying these factors here, the judge found a valid inference of fraudulent intent based on the following factors:

- Badge 1 ("transfer of property by a debtor during the pendency of a suit"): Continental had made it clear that legal action would follow if the contractual dispute, initiated in March 2001, was not resolved. Indeed, Continental filed suit for breach of contract on June 6, 2001, and the sale to Acceptance closed later that same day.

- Badge 2 ("transfer of property that renders the debtor insolvent or greatly reduces his estate"): IGF and Symons International were insolvent.

- Badge 3 ("a series of contemporaneous transactions which strip a debtor of all property available for execution"): In just this one transaction, IGF received less than half the value of its business, leaving it unable to satisfy any execution of its debt to Continental.

- Badge 5 ("any transaction conducted in a manner differing from customary methods"): The transaction differed from customary methods by transferring purchase-price consideration to

---

1. These "badges" include:

(1) the transfer of property by a debtor during the pendency of a suit; (2) a transfer of property that renders the debtor insolvent or greatly reduces his estate; (3) a series of contemporaneous transactions which strip a debtor of all property available for execution; (4) secret or hurried transactions not in the usual mode of doing business; (5) any transaction conducted in a manner differing from customary methods; (6) a transaction whereby the debtor retains benefits over the transferred property; (7) little or no consideration in return for the transfer; and (8) a transfer of property between family members.

*Otte v. Otte*, 655 N.E.2d 76, 81 (Ind.Ct.App. 1995).

unjustified noncompetes and reinsurance. (More on this later.)

- Badge 7 ("little or no consideration in return for the transfer"): IGF received inadequate consideration in the transfer (less than 50% of the going market price).
- Badge 8 ("a transfer of property between family members"): The transfer was essentially between family members.

Based on these findings and the absence of evidence otherwise justifying the structure of the transaction, the judge concluded that assets were transferred "with actual intent to hinder, delay, or defraud" in violation of § 14(1).

The judge also found a violation of § 14(2) because the transfer was not made "for reasonably equivalent value," IGF was insolvent at the time of the sale, and it knew or should have known that as a result of the transaction, it would be unable to pay its debts as they became due.

We don't think the judge clearly erred in any of these findings, which were based largely on his subsidiary findings about the noncompetes and reinsurance treaty, to which we now turn.

### (i) Noncompetes

The defendants would have us believe that the noncompetes were legitimate in large part because the expert testimony offered by Continental was procedurally and substantively flawed. They claim that Continental's expert on the noncompetes, David A. Borghesi, should not have been allowed to testify and also that his testimony was flawed.

■ On the admissibility question, the judge found that Borghesi, a CPA by training, is an experienced auditor and forensic accountant and rejected the defendants' objections to his expertise relative

to the question on which he was opining. The defendants had argued that Borghesi was insufficiently experienced in valuing noncompetes. The judge ruled that this objection concerned the weight of his testimony, not its admissibility. That was not an abuse of discretion.

■ The defendants contest Borghesi's conclusion that the chairman of Acceptance had reason to believe the Symonses would have trouble getting a standard reinsurance treaty from the Federal Crop Insurance Corporation and thus were effectively incapable of competing against Acceptance in the crop space, rendering the noncompetes valueless. But the record supports Borghesi's conclusion in this regard. Acceptance's chairman specifically testified at trial that it "would be highly unlikely that [the Symonses] would be able to get a new [Standard Reinsurance Agreement] any time—any time soon."

The defendants also argue that the noncompetes had value insofar as they prevented Symons International and Goran from acquiring any Acceptance competitors as operating companies. But that does nothing to rebut the judge's conclusion that the two holding companies were not themselves competitive threats. And even if there were some theoretical value to Acceptance in keeping Symons International and Goran from acquiring or launching a competitor, that threat was infinitesimally small since both companies were insolvent.

Lastly, the defendants complain about Borghesi's failure to use a so-called "with and without" methodology for valuing the noncompetes. Yet Borghesi was fully capable of using that valuation method, but in the end didn't have to run the numbers because he concluded that any benefit to Acceptance was simply nonexistent.

Beyond objecting to the expert's testimony, the defendants more generally contend that the noncompetes were serious efforts to preclude harmful competition against Acceptance. To engage this argument, we need to ask, just what was Acceptance buying? A noncompetition agreement is a tool by which a business's goodwill is protected by the purchaser. *See Kladis v. Nick's Patio, Inc.*, 735 N.E.2d 1216, 1220 (Ind.Ct.App.2000). But there must be *something* the purchaser is buying when it contracts for a noncompetition agreement; otherwise the noncompete is a sham. *See, e.g., United States v. Black*, 530 F.3d 596, 605–06 (7th Cir.2008) (Lord Black and his lawyer were convicted of having arranged multimillion dollar noncompetes that "made no sense" because Black was "on [the] way out of the newspaper business."); *SEC v. Black*, No. 04 C 7377, 2005 WL 1498893, at *5 (N.D.Ill. June 17, 2005); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2005 WL 589000, at *2 (N.D.Ill. Mar. 11, 2005).

Here there was no goodwill to buy from the two holding companies, Symons International and Goran. The employees of IGF with competitive knowledge were all neutralized by Acceptance separately. As the judge observed,

> Both entities lacked the infrastructure and crop insurance goodwill—including employees with knowledge of the crop insurance business and special relationships with customers and agents—necessary to compete in the crop insurance business. In addition, both entities lacked the ability to compete as both were insolvent and unlikely to obtain a [Standard Reinsurance Agreement] from the [Federal Crop Insurance Corporation].

This finding also undercuts the defendants' argument that Symons International and Goran could have acquired a competing crop-insurance enterprise. With what money? They were insolvent. All of which is to say that the judge did not clearly err in concluding that the noncompetes only make sense as a fraudulent diversion of the purchase money for the crop-insurance business, not as a purchase of goodwill and legitimate protection from competition.

### (ii) Reinsurance

The defendants also argue that the reinsurance treaty was independently valuable. Here, too, they say the judge erred factually and in admitting Continental's expert testimony. We don't see how.

The defendants first contend that James L. Driscoll, Ph.D., one of Continental's reinsurance experts, was insufficiently experienced to price reinsurance. This argument is hard to take seriously. Driscoll is an underwriter at the Federal Crop Insurance Corporation and has spent his entire career in the crop-insurance industry as an underwriter and actuary.

Next we're told that Driscoll's analysis of the actual value of the Granite Re reinsurance treaty was flawed because it relied on a "pure premium" analysis. That is, Driscoll supposedly compared the actual treaty to the minimum amount of premium the insurer would need to pay expected losses, which (the defendants say) is not a realistic comparison. The problem with this argument is that Driscoll didn't really do that: instead he observed that the pure premium is the *minimum* amount the insurer needs to collect in order to break even, so while it is clearly not "apples to apples" for an actual treaty, it's instructive nevertheless. (It goes without saying that the price of the pure premium—around $45,000—was nowhere near the $15 million price tag on the treaty.)

The defendants also claim that Driscoll miscalculated the total exposure to be miti-

gated in a pure-premium reinsurance analysis by a factor of three. Even assuming he did, the pure premium would still be orders of magnitude less than the $15 million Alan charged for the reinsurance. In short, even if we assume that Driscoll made all the errors the defendants insist that he did, the basic parameters of his opinion still remain intact: the actual value of the reinsurance treaty was nowhere near its cost. The judge's fact-finding on this point was not clearly erroneous.

We hear similar complaints about Continental's other reinsurance expert, William E. Totsch. The defendants challenge Totsch's calculations regarding the reasonableness of the Granite Re treaty by comparing it to a supposedly similar treaty Acceptance had with Scandinavian Reinsurance ("ScanRe"). The ScanRe treaty and the Granite Re treaty were more or less comparable, the defendants maintain, which means that it would not have been unusual for Acceptance to purchase the kind of loss mitigation provided by Granite Re here. The problem is that the ScanRe treaty was materially different from the Granite Re treaty in the extent to which ScanRe shared risk with the government and also in its terms of termination.

Finally, the defendants claim that because Totsch didn't purport to offer an opinion on the "value" of the Granite Re treaty, it was a mistake for the judge to observe that Totsch "opined as to the value of the Reinsurance Agreement." But when push came to shove and the judge actually analyzed Totsch's testimony, he correctly characterized it as an opinion on "the costs of the contract." That is, Totsch compared the price of the premium to the potential exposure from loss and concluded that the price didn't match the risk. This isn't pricing the *value* of the instrument but rather evaluating the price-to-risk ratio faced by Acceptance. This

helped the judge conclude that the instrument was vastly overpriced.

In sum, we see no error in the judge's conclusion that this $15 million reinsurance treaty—which was both suggested by Alan Symons and outside industry norms—was unjustified and overpriced. It follows that the judge committed no error in deeming this payment a diversion of the purchase money for the crop-insurance business.

### 2. *Who is Liable under the IUFTA?*

So IGF executed a fraudulent transfer, but are the other defendants liable? The defendants say no, arguing that (1) Alan and Gordon Symons can't be liable transferees under the statute as mere participants in the deal; and (2) the sale money from Acceptance to Symons International, Goran, and Granite Re isn't an "asset" transferable under the statute. The first of these issues is one of first impression under Indiana law.

#### (i) Transferee liability

Alan Symons and the Estate of Gordon Symons argue that they cannot be held liable for fraudulent transfer because the IUFTA does not account for "participation" liability.

The IUFTA supplies two possible remedies: the defrauded creditor can avoid the transfer in rem or recover a judgment for the value of the transfer from liable parties, including "(1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." IND.CODE § 32–18–2–18(b). This language tracks section 8 of the Uniform False Transfer Act.

Everyone agrees that Alan and Gordon were not direct beneficiaries of the transfer (unlike Symons International, Goran,

and Granite Re). So Alan and the Estate argue that they can be held liable only under a sort of accessory "participation" theory of liability, which has not been incorporated into the IUFTA. As support for this proposition, they cite *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 630 (7th Cir.2002). There we found no legal authority for the proposition that an "insider" could be liable under the Illinois version of the UFTA. At issue in *APS* were corporate officers who benefited indirectly from the transfer in question. *Id.* at 629.

Alan and the Estate also rely on a district-court decision noting that the IUFTA lacks accessory liability. *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03–CV–0132–DFH, 2004 WL 771230, at *14 (S.D.Ind. Mar. 24, 2004) (Hamilton, J.). *Baker O'Neal* involved a claim of accessory liability against the accounting firm Ernst & Young, which had provided extensive financial advice for a likely insolvent corporation in exchange for $600,000 in fees. The district court in *Baker O'Neal* concluded that on balance, the caselaw pretty clearly established that there would be no basis for accountants *qua* accountants to be held liable as accessories to the client's fraudulent transfer.[2] Finally, the defendants cite to *Shi v. Yi*, 921 N.E.2d 31, 38 (Ind.Ct.App.2010), which held that common-law fraud remedies cannot be imported into an IUFTA action.

On the other side of the ledger, in *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.* 384 F.3d 338, 347 (7th Cir.2004), we considered whether an individual corporate actor could be held liable under the IUFTA under common-law fraud principles for his *personal participation* in the fraud. Finding "no case

suggesting that 'veil piercing' is impermissible under the UFTA," we noted that

[l]iability for officers or shareholders of a "first transferee" who personally participated in the fraud is a substitute for "veil piercing," not an extension of who can be a "transferee" under the UFTA. Moreover, the reasoning behind the general rule that courts should avoid extending the parties who can be a "transferee" under the UFTA appears to be based, at least in part, on the difficulty of proving damages.

*Id.* In other words, we suggested that if the IUFTA contemplates this kind of liability, it's really an alternative avenue of seeking alter-ego liability—not an expansion of the definition of "transferee" to include vicarious liability. Nevertheless, "in an abundance of caution," we certified the question to the Indiana Supreme Court. *Id.* at 349. But the case settled before the state high court could provide an answer.

In the end we don't need to resolve whether Alan and Gordon's Estate can be liable as IUFTA "transferees." The idea that veil-piercing principles can apply in this context is sound. *See id.* at 348. Thus, even without the district judge's findings on their liability for participation in the fraud, the judge's alter-ego findings are enough to put Alan and Gordon's Estate on the hook without broadening beneficiary liability under the IUFTA to include vicarious or participatory liability.

### (ii) The transfer itself

█ The defendants also make a very formalistic argument that the money paid to Goran, Symons International, and Granite Re never belonged to IGF, so it couldn't really have been transferred fraudulently. They noted that the statute

---

**2.** It's worth noting that *Baker O'Neal* doesn't seem to turn on the definition of "transferee" but rather the scope of the IUFTA's "catchall" provision at section 17(a)(3)(C).

defines "transfer" as "disposing of or parting with an asset," IND.CODE § 32–18–2–10, and an "asset" is "property of a debtor," *id.* § 32–18–2–2. So if the debtor doesn't own something, he can't transfer it. *See Grand Labs., Inc. v. Midcon Labs of Iowa,* 32 F.3d 1277, 1281 (8th Cir.1994) ("To recover on a fraudulent conveyance claim, a plaintiff-creditor must first show that the transferor actually owned the property that it allegedly fraudulently transferred.").

■ This argument is creative but fundamentally misunderstands a basic precept of fraudulent-transfer doctrine: substance trumps form. As we have frequently noted in an analogous context, "fraudulent conveyance doctrine ... is a flexible principle that looks to substance, rather than form." *Boyer v. Crown Stock Distribution, Inc.,* 587 F.3d 787, 793 (7th Cir.2009) (quotation marks omitted); *see also In re Joy Recovery Tech. Corp.,* 286 B.R. 54, 74 (N.D.Ill. Bankr.2002) ("Courts will eschew appeals to form which obscure the substance of a transaction. Thus, a multilevel transaction will be collapsed and treated as a single transaction in order to determine if there was a fraudulent conveyance.").

The IUFTA incorporates this principle in another part of the definition of "transfer" that the defendants conveniently ignore: a transfer is "disposing of or parting with an asset or an interest in an asset, *whether the mode is direct or indirect.*" § 32–18–2–10 (emphasis added); *see also, e.g., In re Unglaub,* 332 B.R. 303, 316 (N.D.Ill.Bankr.2005) ("For purposes of the [Colorado Uniform Fraudulent Transfer Act], equity looks to the substance of the transaction rather than its form."); *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 638 (2d Cir.1995) (holding that "the District Court correctly disregarded the form of this transaction and looked instead to its

substance" under the New York Uniform Fraudulent Conveyance Act).

Here the deal between IGF and Acceptance was structured to keep more than half the purchase price away from IGF and in the hands of the Symonses. The sleight of hand on which the defendants now rely was the very means of the fraud. If anything, this is a textbook example of why the law of fraudulent transfer privileges substance over form.

### C. Alter Ego

■ Lastly, Alan and Gordon challenge their alter-ego liability. This issue too gets deferential review; we will reverse only for clear error. *See Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1294 (7th Cir.1992); *In re Bowen Transps., Inc.,* 551 F.2d 171, 179 (7th Cir. 1977); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,* 85 F.3d 1282, 1288–89 (7th Cir.1996) (adopting a clearly erroneous standard in a veil-piercing-like "common control" claim). After all, veil-piercing is a highly fact-intensive inquiry. *See Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1232 (Ind.1994).

■ Indiana courts hesitate to pierce the corporate veil but will do so to prevent fraud or injustice to a third party. *See id.* Generally speaking, the corporate form "may be disregarded where one corporation is so organized and controlled and its affairs so conducted that it is a mere instrumentality or adjunct of another corporation." *Smith v. McLeod Distrib., Inc.,* 744 N.E.2d 459, 462 (Ind.Ct.App.2000).

■ Alter-ego analysis in Indiana proceeds along the so-called *Aronson* factors, which include:

(1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or

directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson v. Price,* 644 N.E.2d 864, 867 (Ind.1994). Where, as here, a court "is asked to decide whether two or more affiliated corporations should be treated as a single entity," the analysis expands to consider other factors in addition to those from *Aronson,* including "whether similar corporate names were used; whether there were common principal corporate officers, directors, and employees; whether the business purposes of the corporations were similar; and whether the corporations were located in the same offices and used the same telephone numbers and business cards." *Smith,* 744 N.E.2d at 463 (citations omitted).

▉ . The defendants argue as a threshold matter that this case lacks the sort of injustice necessary to warrant a veil-piercing inquiry. Caveat emptor, they shrug. Continental knew what it was getting into when it sold its crop-insurance business to IGF. It was never misled. That IGF can't pay makes this merely "an unsatisfied judgment" and no reason to pierce the corporate veil. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec,* 529 F.3d 371, 381 n. 1 (7th Cir.2008).

We're not persuaded. Yes, it's true that Continental was a sophisticated market actor; any deal can turn sour and sometimes judgments go unsatisfied. But none of this makes it just or fair for the Symons family to have structured the *later* sale of the business to Acceptance to syphon assets away from IGF to evade the debt to Continental, which is what the noncom-

petes and reinsurance in this deal accomplished. If nothing else, Continental had reason to believe that IGF wouldn't dump the crop-insurance business for less than half its value. We think this constitutes injustice to a third party.

Moving on to the alter-ego test itself, the findings here were amply supported by the record. The judge found that "Alan, Doug, and Gordon Symons ignored, controlled, and manipulated the corporate forms" of IGF, IGF Holdings, Symons International, Granite Re, Superior, Pafco, and Goran, and "operated the corporations as a single business enterprise such that these entities were mere instrumentalities of the Symons family." Thus, fraud was present and the corporation was operated as a mere instrumentality of the alter-ego liable parties.

The judge evaluated the *Aronson* and *Smith* factors as follows:

- *Undercapitalization.* The judge did not find the companies undercapitalized for the purposes of the *Aronson* test because "[t]he adequacy of capital is to be measured as of the time of a corporation's formation." *Cmty. Care Ctrs., Inc. v. Hamilton,* 774 N.E.2d 559, 565 (Ind.Ct.App.2002). Nevertheless, the judge noted that the fact that almost all of the Symons companies were undercapitalized as of 1999 "cannot be ignored."

- *Fraudulent representation by corporation shareholders or directors.* The judge found that the Symons family and the corporate counterclaim defendants had made fraudulent representations to regulatory agencies and the general public, in particular misrepresentations to the Federal Crop Insurance Corporation.

- *Corporate formalities.* The judge found that corporate formalities maintained by the Symons-controlled com-

panies were "entirely 'cosmetic.' " The Goran and Symons International boards met at the same time and place on 18 separate occasions between March 1997 and May 2001. IGF and Superior held coterminous board meetings three times. Lastly, Alan Symons was the principal representative of IGF, IGF Holdings, Symons International, Goran, and Granite Re during negotiations with Acceptance.

- *Commingling Assets.* The companies all made extensive use of intercompany loans, purchases, sales, securities, real estate, mortgages, and other investments. There was vertical overlap between IGF and IGF Holdings in their payroll. In 2001 IGF, Superior, and Pafco were all incurring significant operating losses while their holding companies made over $40 million from the operating companies in management and service agreements.

- *Common Address.* Goran, Symons International, IGF, IGF Holdings, Pafco, and Superior all shared a business address in Indianapolis.

Based on these findings, the judge concluded that the Symonses used their control over the Goran-related companies to fraudulently avoid satisfying the debt to Continental.

The defendants argue that the judge's analysis improperly blends the *Aronson* and *Smith* tests and that the judge failed to consider what they insist is the key *Aronson* inquiry: shareholder abuse and shareholder use of the corporation as a conduit for personal affairs. *See Aronson,* 644 N.E.2d at 868.

As we've explained, however, *Aronson* isn't exclusive. *Aronson* dealt with shareholder alter-ego liability, and Indiana decisions hold that the *Aronson* factors are "not necessarily exhaustive." *Fairfield Dev., Inc. v. Georgetown Woods,* 768

N.E.2d 463, 469 (Ind.Ct.App.2002); *see also Stacey–Rand, Inc. v. J.J. Holman, Inc.,* 527 N.E.2d 726, 728 (Ind.Ct.App. 1988) ("While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted."). Furthermore, *Aronson* itself contemplated the sort of corporate-formality inquiry later applied in *Smith* to corporate-sibling liability. To see this one need only look to the full sentence the defendants invoke from *Aronson:* "*Lack of observance of formalities* can provide circumstantial evidence of shareholder abuse and shareholder use of the corporation as a conduit for personal affairs." 644 N.E.2d at 868 (emphasis added). Thus, we think the judge was correct to look to the factors identified in both *Aronson* and *Smith* to determine whether Alan and Gordon used their control over the corporate empire to enrich themselves at the expense of Continental.

The defendants also say that the Symons-family empire does not satisfy the "single business enterprise" rule for veil piercing. They argue that their conglomerate comprised decidedly separate companies and thus is not really eligible for veil piercing. In particular, the companies had different names, different directors and officers, different business purposes, and different locations, thus precluding them from being deemed a single business enterprise.

 But that isn't the rule—or at least it's not the whole rule. In fuller context *Smith* said,

[W]e have previously noted that other jurisdictions have disregarded the separateness of affiliated corporations when the corporations are not operated as

separate entities but are *manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud, or injustice* or to permit one economic entity to escape liability arising *out of an operation conducted by one corporation for the benefit of the whole enterprise.*

744 N.E.2d at 463 (emphases added). To that end, "[i]ndicia of common 'identity,' 'excessive fragmentation,' or 'single business enterprise' corporations may include, among other factors, the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public." *Id.* That's almost precisely what we have here: IGF conducted an operation for the benefit of the Goran empire that was controlled as one enterprise by the Symons family.

■■■ Nevertheless, the defendants also contend that the Goran companies can't be considered "controlled as one enterprise" because they were regulated businesses and some were publicly traded. There's no rule that publicly traded companies are exempt from veil-piercing, and the defendants don't point to one. It's true that veil-piercing is *usually* applied to closely held corporations, but that has more to do with the ease of abusing the corporate form in a closely held corporation than anything else. It isn't a necessary condition for an alter-ego claim.

Indeed, other courts have not ruled out piercing the veil of public companies. *See Birbara v. Locke,* 99 F.3d 1233, 1237–38 (1st Cir.1996) ("The key Massachusetts cases on piercing the corporate veil have all involved close, family-owned defendant corporations. In this silence, we will assume, dubitante, that Massachusetts would apply the same standards in deciding whether to pierce the corporate veil when the defendant is a public corporation as it has when the defendant is a close corpora-

tion."). And it has happened before. *See Nerox Power Sys., Inc. v. M–B Contracting Co.,* 54 P.3d 791 (Alaska 2002). If there *were* a rule against public-company veil-piercing, it would be justified by a concern about innocent third-party shareholders. But here both Goran and Symons International have been delisted from the NASDAQ, so that's of limited salience.

■■■ Similarly, the fact that the insurance industry is heavily regulated changes nothing of significance here. Unless the defendants can show that regulatory requirements prevented the Symonses from manipulating their companies (and they can't), this argument doesn't get off the ground.

Lastly, the defendants argue that the *Aronson* and *Smith* factors simply don't support veil-piercing given the facts of this case. The company names were different. There were some independent directors. Each operating company was doing business in a different insurance sector (e.g., IGF was in crops, Superior in autos). All the businesses had different headquarters.

It's a nice try, but on this record we don't think the judge's factual findings regarding alter-ego liability were clearly wrong. Corporate formalities were both cosmetic and ignored. (For example, while the companies had different headquarters, Symons International, Goran, IGF, and Pafco all gave regulators the same address in Indiana as their actual base of operations.) Assets were commingled—indeed, the corporations all seem to have raided one another with some degree of impunity. Symons family members received millions of dollars in no-interest, unsecured loans from their companies. Finally, Alan was the principal agent of all the relevant companies and the architect of the sale. In short, the record amply supports the judge's decision to pierce the corporate veil. *Cf. Wachovia Sec., LLC v.*

*Banco Panamericano, Inc.,* 674 F.3d 743, 753–54 (7th Cir.2012) (veil-piercing was justified in part by a looting of corporate assets following a margin call); *Fairfield Dev.,* 768 N.E.2d at 472–73 (veil-piercing was justified when there were corporate loans that were really personal, commingled assets, one office, shared property, intercorporate cost coverage, and judgment proofing).

* * *

To summarize: The judge did not clearly err in finding Symons International liable as an obligor under the Strategic Alliance Agreement. Likewise, we find no error in the judge's ruling that Symons International, Goran, and Granite Re are liable under the IUFTA. And while we are not prepared to say that Alan and the Estate of Gordon Symons are liable as transferees under the IUFTA, they *are* liable under alter-ego theory.

AFFIRMED.